No. 31,508

GEORGE H. FLENTIE and VIRGIE FLENTIE, *Appellees,* v. C. R. TOWN-SEND, JR., *Appellant.*

(30 P. 2d 132.)

Opinion filed March 10, 1934.

*R. M. Emery, Jr.,* of Seneca, *W. J. Gregg, E. M. Gregg,* both of Frankfort, and *Henry E. Sampson,* of Des Moines, Iowa, for the appellant.

*James L. Haley,* of Sabetha, for the appellees.

The opinion of the court was delivered by

THIELE, J.: This was an action for damages on account of the death of a child following a surgical operation.

The petition alleged two causes of action against C. R. Townsend,

Jr., hereafter referred to as the defendant, and one W. E. Hartsock, on whom no service of process was had, which are summarized as follows: The first cause of action charged that plaintiffs were the parents of an eight-year-old boy and had consulted the defendant with reference to an operation for removal of the boy's tonsils; that defendant was an osteopath and not learned or skilled in the art of surgery and knew little of the care or treatment of surgical cases, a fact of which plaintiffs were not aware; that later the defendant solicited plaintiffs to have the boy's tonsils removed by one Doctor Hartsock, of St. Joseph, Mo., whom defendant represented as a highly skilled and competent surgeon, and that Doctor Hartsock would bring with him a competent and skillful surgical nurse to assist in the operation and properly care for the patient thereafter; that plaintiffs did bring in the boy to defendant's office and the operation was performed in a negligent manner, that there was a failure to close the wound and stop and control the hemorrhage of blood; that shortly after the operation was performed and while the boy was still bleeding the doctor and nurse left and the care of the boy was left to defendant; that the bleeding continued; that plaintiffs repeatedly called the defendant and requested he take steps to control the bleeding and in the morning of the following day called another surgeon. About the time he arrived, Doctor Hartsock returned and a second operation was performed, which stopped the flow of blood, but the boy was too weak to rally and died as a result of the carelessness, negligence and malpractice of defendant and Doctor Hartsock.

The second cause of action made the first cause of action a part thereof and charged further that after the operation was performed the boy was not properly cared for and that the hemorrhages were permitted to continue when they could have been stopped by exercise of proper care, skill and attention; that shortly after the operation Doctor Hartsock left and abandoned the boy, leaving him in the care of defendant, and although the plaintiffs beseeched him to take steps to control the hemorrhages he failed to do so until about ten o'clock of the day following, when a second operation was performed, but notwithstanding the boy died as a direct result of the loss of blood caused by the gross negligence and lack of care upon the part of defendant.

The trial resulted in a verdict for plaintiffs against the defendant, who appeals, alleging as error the failure of the court (1) to sustain

his demurrer to plaintiff's evidence, (2) to sustain his motion for a directed verdict in his favor, (3) to give certain instructions which would have directed a verdict in his favor, and that the verdict is the result of bias or prejudice, and that his motion for a new trial was overruled. Consideration of the above requires a review of the evidence adduced by the plaintiffs or favorable to their contentions.

The father of the boy testified the defendant approached him about a month before the operation and said he heard that plaintiff's wife needed to have her tonsils removed, and upon learning that plaintiffs' children needed such an operation stated he was getting a bunch of patients together; that he was going to have Doctor Hartsock come out from St. Joseph, Mo., to perform the operations; that on the Saturday preceding the operation on Monday, the defendant solicited him at his home, told him more about Doctor Hartsock's skill, and on Monday he brought in his two children, the boy who died and a younger sister; that the boy was eight years of age and had been going to school regularly, having missed only one-half day in two years on account of sickness. He testified in detail about being present when preparations were made and the operation performed, which occurred shortly after ten o'clock in the morning. After the operation by Doctor Hartsock the boy was turned over to defendant, who was to take care of him. In the conversation defendant stated the nurse would remain as long as the patient required, but Doctor Hartsock and the nurse left about 12:30. After the operation the boy was taken into a room at defendant's office and remained there until 7 p. m. and was then removed to the home of plaintiff's brother, where he remained until death occurred. The boy's throat bled immediately following the operation, and just before Doctor Hartsock left he gave a hypodermic injection, which he said was to coagulate the blood. The bleeding continued, and the parents called the defendant's attention to it and he said it was all right. After the injection the bleeding was not as bad as before. The child vomited irregularly, sometimes every hour and a half, sometimes less, but each time he would vomit red blood. About midnight the father called defendant, who then gave another hypodermic. Again at 3:30 a. m. the father called the doctor and talked with him, but the doctor did not come to see the boy, though he told the father to give him nourishment and he would see him in the morning. The throat had been bleeding all night and was still bleeding at eight o'clock in the morning when

the father went after the defendant and told him to come over. "I told him he had better come right now and bring some one with him that knew more than he did." The defendant came and brought his father, who was a medical doctor and not an osteopath. The elder Townsend advised warming the boy, who was growing cold, and the giving of nourishment. The parents were alarmed at the child's condition, and the father told defendant he was going to and he did call Doctor Newman, a surgeon at Axtell. · Doctor Newman came about 9:30 a. m. and examined the boy and said he was badly depleted of blood; he looked at the boy's throat and said he was bleeding "like the devil." At that time he instructed the mother with respect to giving of nourishment per rectum, and this was done. Doctor Newman called his nurse and directed her to bring his surgical appliances. Shortly after the nurse arrived, Doctor Hartsock also came and a second operation was performed. At that time the boy had been bleeding, but the second operation stopped the hemorrhages. About four o'clock the boy died. Defendant told the father the boy died "of tonsiline hemorrhage." The father further testified that when the arrangement was made for the operation, defendant agreed to care for the patients when Doctor Hartsock left, and "I wanted Hartsock to stay and I begged him to stay, and he said Doctor Townsend could let him know and he would be back in two hours if he were needed." Mrs. Virgie Flentie, the boy's mother, testified to about the same facts as her husband. She stated that the boy bled all the time; that there were two real bad times that he bled and then he bled off and on until they stopped the hemorrhage by the second operation; that the blood was bright red blood. She then stated when the defendant was called at 3:30 a. m. the boy was not in as good condition as when seen at midnight; that he was getting cold and that his throat kept bleeding.

Doctor Newman testified, among other things, that he found the boy in a state of shock; that when he arrived he got a history of the case and tried to examine the throat, but the boy was restless and he couldn't examine him well, but couldn't see any bleeding at that time. Suddenly the boy vomited bright blood. "I decided after I saw this red blood that I didn't care, under my care, for the boy to have any more shock, and I thought it best to not take any chances with any more bleeding." When Doctor Hartsock came, the pillars of the tonsils were sewed and that stopped the bleeding. When the child was under anæsthetic for the second operation Doctor

Newman examined the throat and there was bleeding on one side. He also stated that the bleeding would be faster or slower at times, but that all that was needed to stop the hemorrhages was to take one or two stitches, but that it was not proper to wait until an emergency happened and then sew it up. He further stated the boy seemed to rally after the second operation and he left the house and was not called until it was too late. He was examined as to proper treatment and stated that the blood noticed was a venous oozing, but that if blood oozes from a vein for a sufficient length of time it is just as fatal as from an artery. Arthur Gennerette, whose child was also operated upon the same day by the same surgeon, stated he saw the boy up to three o'clock that afternoon and saw him throw up, and it looked like there was blood in it. While somewhat extended, the above is only a portion of the evidence which went to prove the plaintiff's case, but we deem it sufficient for our discussion here. The record does not show any objections by defendant to the introduction of any of plaintiffs' evidence.

At the close of plaintiffs' case defendant interposed his demurrer, which was overruled. When the defendant's evidence had been introduced, he moved the court to direct a verdict in his favor, which motion was overruled as to the first cause of action. It was held in *Stout v. Bowers,* 97 Kan. 33, 36, 154 Pac. 259, that—

"If the demurrer to plaintiff's evidence could not be sustained a verdict against her could not be directed, because of conflicting evidence subsequently produced in behalf of the defendants. Her case might have been strengthened by the testimony offered in their behalf, but on the motion to direct a verdict the *prima facie* case made by her testimony could not be weakened or destroyed by theirs."

We are only concerned, therefore, with whether the plaintiffs' evidence supports the cause of action based on proper care.

Appellant cites the rule laid down in *James v. Grigsby,* 114 Kan. 627, 632, 220 Pac. 267, that—

"What is proper treatment to be used in a particular case is a medical question to be testified to by physicians as expert witnesses; laymen, even jurors and courts, are not permitted to say what is the proper treatment for a disease or how a specific surgical operation should be handled,"

but ignores the limitations thereafter stated that—

"Results, if so pronounced as to be apparent, may be testified to by anyone. (*Sly v. Powell,* 87 Kan. 142, 123 Pac. 881.) And where negligence in the treatment is shown by medical witnesses and the evidence shows a bad result, it is

the province of the jury to say whether the result was caused by negligence." (p. 632.)

In *McMillen v. Foncannon*, 127 Kan. 573, 274 Pac. 237, this court had occasion to again consider the question, and after quoting the first portion of the quotation from *James v. Grigsby*, supra, said:

"This rule can, be applied, of course, only to those matters clearly within the domain of medical science. It is not a judicial determination that the members of the medical profession have a monopoly on common sense. Matters within the common knowledge of mankind may be testified to by anyone familiar with the facts. In *Pettigrew v. Lewis*, 46 Kan. 78, 81, it was said: 'Cases may arise where there is such gross negligence and want of skill in performing an operation as to dispense with the testimony of professional witnesses.' (Citing cases.)" (p. 576.)

Tested by both the rule and its limitations, what is the situation? First, it may be observed that it makes no difference as to defendant's version of the facts and the testimony of his expert witnesses, if there was competent evidence from which a conclusion could be drawn by the jury favorable to plaintiff's contention.

Taking up first the question of proof by expert witnesses: Doctor Newman testified that when he arrived on the scene the boy was in a state of shock; that while he was there and before the second operation was performed, the boy had a hemorrhage; that it was necessary that the bleeding be stopped, and that it was not proper to wait until an emergency arose and then sew up the wound; that all it was necessary to do was to sew up the pillars to stop the bleeding; that what caused the weakened condition was the operation followed by some bleeding; that the boy couldn't have had rest and relaxation under the conditions; that there was shock from the anæsthetic and from the child being without food for a period of over twenty-four hours. Doctor Newman would not state what was the immediate cause of death. This testimony cannot be isolated from the proper testimony of lay witnesses, but must be considered in connection therewith. The father testified about his reports to the defendant, what the defendant did, and what the defendant said was the cause of the boy's death. Gauged by the medical testimony rule, enough had been shown to take the case to the jury, and the jury, on this phase of the matter, was warranted in concluding that if the defendant were competent to judge and did know what proper treatment was, he would know not only that the child

was bleeding, but how to stop it, and would also have seen to it that the child was properly nourished so as to conserve and reëstablish his strength, and that he had not given the case sufficient attention and exercised that degree of care incumbent upon him under the circumstances.

But under the rules previously stated, this case need not be so disposed of. As was said in *Miller v. Foncannon,* supra:

"Matters within the common knowledge of mankind may be testified to by anyone familiar with the facts." (p. 576.)

It required no doctor to inform the jury that when a surgical operation was had upon the throat and thereafter the patient spat up blood, that it was blood. The fact that the boy vomited, the frequency thereof, the testimony of the color, the effect on the child, were facts that any person of ordinary intelligence could discern, and evidently the jury saw fit to believe that the father vainly called the doctor about 3:30 in the morning, and a few hours later, believing the child was not being properly treated, called in another physician, who promptly saw to it the boy was nourished, and assisted Doctor Hartsock in a second operation which stopped the bleeding. There was also the father's statement that defendant told him the boy died "of tonsiline hemorrhage." The plaintiff's evidence also showed that the defendant undertook the care of the boy following the operation; that he permitted the bleeding to continue, the giving of the hypodermic injection at midnight being all that was done to stop it, and that he made no effort to call Doctor Hartsock until the parents had called Doctor Newman. The above-recited lay testimony, together with the medical testimony previously referred to, made a *prima facie* case, prevented a ruling favorable to the defendant on his demurrer, and precluded a directed verdict in his favor.

It is not necessary to review the defendant's evidence. The most that can be said is that it contradicted that of plaintiffs. The jury resolved the matter in favor of the plaintiffs, and its verdict, being supported by competent evidence, is conclusive here.

The argument on the specification of error that the verdict of the jury is the result of mistake, bias and prejudice, is based on appellant's version of the testimony. Under all the evidence the jury was warranted in arriving at a conclusion contrary to appellant's contention, and having arrived at such a conclusion as

expressed in its verdict, all reasonable inferences and intendments from the evidence must be resolved to support the verdict, which must stand unless it is affirmatively shown that mistake, bias or prejudice existed. There is no such showing here.

The motion for a new trial presented no question which has not been discussed, and it was properly overruled.

The judgment of the lower court is affirmed.