No. 35,034

GLESSNER MARIE BRADLEY, *Appellee*, v. THE ALLIS HOTEL COMPANY, *Appellant.*

(109 P. 2d 165)

Opinion filed January 25, 1941.

*Paul J. Wall, Carl I. Winsor, John E. Boyer,* all of Wichita, and *Marvin P. Richmond,* of Kansas City, Mo., for the appellant.

*C. H. Brooks, Howard T. Fleeson, Carl G. Tebbe, Wayne Coulson, Paul R. Kitch,* all of Wichita, *Roger C. Slaughter* and *Frank O. Knight,* both of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This is an action by the guest of a hotel to recover damages from a defendant hotel company for personal injuries. The action resulted in a hung jury, and defendant appeals from an adverse ruling on its demurrer to plaintiff's evidence and on its motion for a directed verdict at the end of the trial.

The petition in substance alleged: Plaintiff was a guest of the Allis Hotel Company located in the city of Wichita. Defendant held itself out to its guests as being able to furnish to them competent and expert tailoring, cleaning and valet service for the benefit of its guests. The valet shop was under the control and management of defendant, its agents, servants and employees. One of the regular functions of the valet shop was the cleaning, pressing and repair for hire of clothing which might be sent to the shop by defendant's guests. On December 8, 1937, and on all subsequent dates material herein, plaintiff occupied a room in the defendant's hotel as a guest for hire. On December 8th, plaintiff delivered one of her dresses to an agent, servant or employee of the defendant with in-

structions to clean the dress and to mend and repair the hem thereof which had become loose for a distance of approximately twenty-two inches. Defendant's agents, servants or employees, acting within the course and scope of their employment, received the dress and undertook to make the necessary repairs thereon, but negligently and carelessly made the repairs to the hem by using a heavy basting thread and by making long stitches, varying from three-fourths of an inch to an inch in length, and negligently returned the dress to plaintiff's room in a dangerous condition. The hem was not securely fastened to the dress in the usual, customary, safe and workmanlike manner in which such repairs are ordinarily and customarily made. The hem gaped at the stitches to such an extent that the heel of plaintiff's shoe would be likely to become fastened or entangled in the hem and thread, all of which defendant, its agents, servants and employees knew or in the exercise of ordinary care should and could have known. The negligence of defendant was specified as follows:

"(a) In using heavy basting thread in repairing said hem, instead of a lighter thread such as a reasonably prudent workman would have used;

"(b) In making long stitches in the hem of said dress in lengths varying from one-half inch to an inch;

"(c) In failing to warn plaintiff that the dress had been left in a dangerous and unsafe condition;

"(d) In repairing said dress in such a manner that the hem thereof gaped between the stitches in such a manner that plaintiff would, and did, catch her heel therein;

"(e) In failing to use proper care in repairing and stitching the hem of said dress."

It was further alleged: Defendant demanded of and from plaintiff the sum of $1.75 for the repair work, which plaintiff paid. On the morning of December 10, plaintiff put on the dress for the first time, after the work had been done, and went to a drugstore in the city of Wichita at approximately 11:45 a. m. After completing her business there, she started to leave the building. In order to reach the street it was necessary to descend a flight of steps. As she started down the steps, and after having descended one step, the heel of her left shoe caught in the hem or in the loose stitches in the hem of the dress, where it had been improperly and negligently sewed, causing her to be thrown headlong to the bottom of the steps, at which place her head and face struck a door or doorstop, causing serious and painful injuries. The injuries were the direct and prox-

imate result of defendant's negligence. (The extent of the injuries are not material.) The verified answer admitted defendant operated the hotel in the city of Wichita during the month of December, 1937, and denied generally the averments of the petition except as specifically admitted. The answer denied specifically that: Defendant or any of its agents or employees were guilty of any negligence charged; the person to whom plaintiff delivered the dress or the person who made the repairs were the agents or employees of defendant; the acts complained of by plaintiff constituted negligence or were the direct and proximate cause of her injuries; plaintiff ordered defendant or its agents, acting within the scope of their employment, to repair the dress.

The answer further in substance alleged: The repairs were made without the knowledge or consent of defendant. All valet services in the hotel were performed by A. Lentz and not by defendant's agents, servants or employees. Lentz and defendant had entered into an oral contract on or about August 1, 1936, whereby Lentz, in return for the privilege of obtaining the space on the second floor of defendant's hotel building, known as the "Valet Shop," and for the privilege of doing the cleaning and pressing for the patrons of the hotel, agreed to and did pay to defendant, as rent, an amount equal to one-half of the gross receipts from the "Valet Shop." As a further consideration, Lentz agreed to and did dress his "Valet Shop" employees in uniform to conform to the employees of the hotel, and required of them a degree of courtesy and conduct toward the hotel guests similar to that of the hotel employees. For convenience, the hotel made all collections for valet service and accounted once each month to Lentz. Otherwise, defendant exercised no domain or control over Lentz, the valet service, or the employees of Lentz. Plaintiff did not send the dress to the valet shop to be repaired but only to be cleaned and pressed. The customary charge for that service was $1.75. The charge for repairing the dress would have been seventy-five cents, but that charge was not made. The dress was delivered to plaintiff's room on December 8th and plaintiff had ample and reasonable time and opportunity to inspect the dress. Plaintiff was guilty of contributory negligence in failing to inspect the dress and to ascertain its dangerous condition, if in fact, it was in such condition.

The reply of the plaintiff contained a general denial, and further in substance alleged: If defendant had a working arrangement

with Lentz, as alleged by defendant, the arrangement was unknown to plaintiff. Defendant held out the alleged employees of Lentz to plaintiff as its own employees. Defendant dispatched said employees to the rooms of guests desiring valet service, including the plaintiff, and defendant did order, control, and direct such employees in the discharge of their duties. Defendant by permitting the alleged employees of Lentz to wear its uniforms and to answer calls of its guests and to render valet service to them, did by its conduct and course of action adopt and hold out to plaintiff the alleged servants of Lentz as its own servants and employees and is estopped to deny that they were its servants. Defendant, by its own admissions, was engaged in a partnership or joint enterprise with Lentz whereby both participated in the profits arising from the conduct of the valet business located in the hotel. The alleged agents and employees of Lentz were the joint agents and employees of the defendant and Lentz.

The evidence of plaintiff was in substance as follows: For eleven years she had served in the capacity of sales manager for Elmo Sales Corporation of Philadelphia, selling a complete line of cosmetics, with a territory of Missouri, Kansas, Oklahoma, Arkansas, Colorado and Wyoming. She registered at the Allis Hotel as she had always done previously when in Wichita. After going to her room, she unpacked and told the operator she had some valet work to be done. The operator replied she would send the boy up. The boy came and was dressed in an Allis Hotel uniform. It had the word "valet" on it. She gave him the dress and advised she wanted it cleaned, pressed and the hem fixed. He said "All right." The hem was loose a distance of approximately twenty-two inches. The dress was returned and placed in her closet the next morning. Garments returned from the valet shop were placed in her rooms by boys who had a pass key. When she picked the dress up that morning the hem was still hanging a way down. She could not wear it, so she telephoned the operator to send a valet. A boy came, by the name of Eakins, and she told him she had sent the dress to be fixed and they had not fixed it. Eakins took the dress and said he would fix it. He was wearing a uniform similar to the one worn by the first valet. She next saw the dress on the morning of December 10th, when she started to dress. It looked all right so she put it on and went to work. She first went to the coffee shop in the hotel for breakfast and then went in her car from the hotel, to the Fox-

Vliet Drug Store. She was in the drugstore a few hours. In leaving the drugstore she was required to descend steps which led to the sidewalk. As she took the first step she caught the heel of her left shoe in the hem of the dress and was thrown headlong to the double doors and struck her head against the doors and a sharp iron doorstop. She could not get up and one of the men took the heel of her shoe out of the hem of the dress and helped her back upstairs. The heel went through the dress right in the hem. Later she walked to the Innes store and then to the office of Dr. Willard Kiser, and from there to the Allis Hotel, where she remained from Friday until Sunday. She was then taken to Wesley Hospital, where she remained for eleven weeks. Before leaving the hotel on Sunday, Bob Schaeffer, assistant manager of the hotel, came to her room and said:

" 'Miss Bradley, this sure doesn't look like you,' and I said, 'No, it doesn't.' I told him I was trying so hard to get out to the hospital and I said 'I want you to know what put me in the shape I am in' and I took the dress and showed it to him and he said that was a terrible thing, he said, 'We should have never returned it to you in that condition,' and he wanted to take the dress, said he would take it and have it fixed for me and I said no, I would keep the dress with me."

Plaintiff's testimony was further, in substance, as follows: Previously the valet service had been satisfactory except on one other occasion. She had previously sent a new green dress to have it cleaned and pressed and it came back scorched. That was five or six years ago. When it came back in that condition, she took it to Mr. Duggins, who was then the manager of the hotel and told him what had happened. He took her to the cashier and gave her a refund on it and said he was sorry it happened. He called the valet down and told him, "Miss Bradley is a mighty good customer of ours—take care of her." Mr. Duggins made the adjustment on her hotel bill. She always paid for valet service on her hotel bill. During the times she stayed at the hotel she had always been solicited for her valet work when the bellboys came for her bags and when they took her to her room. She had always delivered her garments to the bellboys and to the valets. They came to her room for them. She called for valet service on the house telephone. The telephone would answer "Valet Shop." She had at no time given her garments to any valet boy or employee in the hotel who was not wearing a uniform. Her company required her to stay at the best hotels. She stayed at the Allis because she thought it had the best service. In good hotels you could get any service you wanted. The stitches put

in the hem when it was repaired ranged from one-half to about one inch or a little longer in length. The thread was big thread, doubled like would be used to sew carpet. She first examined the stitches when she got back to the hotel after the accident. She did not see any signs in the hotel which advise that the valet shop was not under hotel management. No manager or assistant manager ever informed her the valet shop was not operated by the hotel. When Mr. Duggins made the adjustment on her scorched dress he did not tell her that the valet shop was not under the management of the hotel. When she sent the instant dress down to the valet shop she thought she was dealing with an employee of the hotel. She relied on the hotel and expected it to do the work in the usual, ordinary and careful manner. The hotel charged her, and she paid it, $1.75 for cleaning and pressing the dress, and for mending the hem.

On cross-examination plaintiff testified in substance: She was forty-eight years of age and had purchased the dress four or five months prior to the accident. She had shoe repair work done while staying at the hotel and the cost of the repair was charged to her hotel bill. The shoes were given to the bellboys and she did not know who repaired the shoes. She did not care who repaired them as long as they were properly fixed. Her laundry work, while at the hotel, was charged to her hotel bill and she did not know who did the work. She did not care so long as it was properly done. Telegrams and telephone calls were likewise charged to her hotel bill. She did not know whether Mr. Lentz operated the valet shop as a tenant in the building. She would have sent the dress to him if she had known he was part of the hotel and that she would get good service.

L. F. Hammond, a witness called by plaintiff, testified in substance: He was vice-president of the Fox-Vliet Drug Company and saw plaintiff on December 10, the day she was in the office on a business call. After the accident she was lying in the lobby of the entrance to the store. There were four steps leading down from the floor of the office. A double door leads from the lobby platform into the street. The height of the steps was from six and one-half inches to approximately eight inches. The stairs were in good repair. There was no loose binding on them at any point.

Perry Eash, a witness called by plaintiff, testified in substance: He had been tailoring continuously since he was discharged from the army in 1919. He had repaired garments for both men and

women. He had made and repaired hems in women's dresses. The thread used in repairing the hem of the instant dress was a heavy double thread ordinarily used to sew buttons on garments. The stitches were approximately one inch in length. The careful and prudent way to do that work is to use the lighter weight thread and to make the stitches from one-eighth to one-fourth of an inch apart. The reason for making the stitches that far apart is the safety factor. The purpose is to keep the hem from coming down and from coming loose. It wouldn't appear very nice if the hem came down or you could possibly catch your heel in the hem.

On cross-examination the same witness testified in substance: He was an expert on women's apparel. The instant stitches were from three-fourths of an inch to an inch in length. Some of them were one-half inch in length. The usual and customary charge for cleaning and pressing a dress like the instant one, in a first-class shop in Wichita, was seventy-five cents.

Defendant demurred to the evidence only upon the following grounds:

1. "Shows no evidence that any negligent act claimed in the petition or by the evidence of the plaintiff was performed by any servant, agent or employee of the defendant, the Allis Hotel.

2. "That the plaintiff has shown herself guilty of contributory negligence.

3. "That under the theory of ostensible agency as claimed by the plaintiff herein, the evidence affirmatively shows that the plaintiff did not rely upon any representation of the agency claimed to exist between the Allis Hotel and one Eakins."

Defendant did not stand upon its demurrer but introduced its evidence. Its evidence disclosed: A written contract was entered into by and between it and Abraham Lentz on December 3, 1931, which expired December 3, 1936; thereafter no new written contract was executed but the parties orally agreed to continue the old contract, except as to the provision for the division of the gross income; instead of Lentz receiving forty-five per cent thereof, as the old contract provided, they agreed to divide the gross income equally.

The old contract referred to the Allis Hotel as the company. For our present consideration it is sufficient to note only certain parts of the old contract, which provided:

1. "That the company, operating Allis Hotel in Wichita, Kansas, agrees to permit the use of a space or room approximately 13 feet by 16 feet, located on the mezzanine floor or third floor of said Allis Hotel, said space located between the third floor service kitchen and the linen room; and the company shall furnish steam, heat, water and electricity reasonably required for said

purposes, without additional charge. The company shall have the right, through its engineering department, to regulate the use of gas, water, electricity and steam in said shop.

2. "That Lentz has installed and furnished all necesary machinery and equipment to operate said pressing and valet shop, and has furnished all necessary or required employees to keep said shop open and properly operating for twenty-four hours per day, all at his cost and expense. Lentz agrees that all such employees shall be under the supervision and control of the company and that they shall conform to the rules and regulations of the company with respect to its employees. Lentz shall require all of said employees to appear in uniform when making pick-ups or deliveries through the hotel Lentz agrees that all workmanship shall be done under his personal supervision and shall be first class in every respect.

3. "That, in consideration hereof, Lentz further agrees: To pay the company fifty-five percent (55%) of the total gross income derived from valet services performed for guests of the hotel for and during the term of this agreement; to make settlement not later than the 10th day of each month following the month in which the said income shall have been made and/or received; to press and make minor repairs on the service department uniforms of the hotel free of charge; to make a minimum charge for cleaning said service uniforms, said minimum charge not to exceed the cost of Lentz of so cleaning same; to keep and maintain the said shop and premises occupied by same clean and free from filth, dirt or waste; and to not cause or permit any nuisance or violation of law in or about said premises; and in all respects to conduct said shop and premises and business in a high-class, orderly and workmanlike manner at all times.

4. "That the company, through its auditing department, shall have the right to lay out and designate all records, books and accounts to be kept by Lentz in the conduct and operation of said business and Lentz shall conform to the system so laid out and prescribed by said department, and shall make such reports as may be demanded or expected under such system; and the company shall have full and free access to said space and premises at all times and to all books, records, and accounts kept by Lentz. All moneys or collections received or made by Lentz shall be delivered and paid over to the company as may be required under its said auditing system; provided, however, that Lentz, in case of emergency, may be permitted to draw against his portion of said receipts, but he shall not make more than four draws or requests within any one calendar monthly period."

Defendant's evidence further disclosed that in the actual performance of the contract it charged the accounts of its guests for valet service, made the collection, deposited the money in its general banking account and Lentz was permitted to draw on the hotel monthly.

In considering the ruling on the demurrer, we are obliged to consider any evidence introduced by defendant which supplied or tended to supply any deficiency, if such existed, in the evidence of

the plaintiff. (*Hayes v. Reid,* 145 Kan. 51, 64 P. 2d 19.) If the evidence, so considered, was sufficient to establish a prima facie case on the theory of actual or ostensible agency, the demurrer was properly overruled insofar as the subject of agency is concerned.

We think the evidence was sufficient to take the case to the jury on either theory. That a prima facie case of ostensible agency was established we think is clear. (*Wilson v. Haun,* 97 Kan. 445, 448, 155 Pac. 798; *Cummins v. Standard Oil Co.,* 132 Kan. 600, 296 Pac. 731; *Blewett v. Errickson,* 134 Kan. 690, 8 P. 2d 357; *Richmond v. Clinton,* 144 Kan. 328, 58 P. 2d 1116; *Manning v. Leavitt Co.,* [N. H.], 5 Atl. 2d 667, 122 A. L. R. 249; *Timmins v. F. N. Joslin Co.,* 303 Mass. 540, 22 N. E. 2d 76; Restatement, Agency, § 267, and *Comment a.*) In view of the contract between defendant and Lentz and the manner in which plaintiff's evidence indicated defendant had operated thereunder, the evidence was likewise sufficient to go to the jury on the theory of actual agency. (*Wilson v. Haun; Cummins v. Standard Oil Co.; Blewett v. Errickson,* supra.)

Plaintiff's evidence clearly established that the work in mending the hem had not been done in an ordinarily careful and prudent manner. We may also state defendant's own evidence was to the same effect.

Defendant next urges plaintiff's evidence disclosed she was negligent as a matter of law. The contention is based upon a part of plaintiff's own testimony. It is true she testified the dress looked all right when she put it on. Defendant urges that plaintiff was, therefore, fully aware of the condition of the hem and was required to exercise a degree of care proportionate to the known danger and that she did not do so. The contention emphasizes a portion of plaintiff's testimony and ignores other portions of her testimony which clearly discloses she was not aware of and did not recognize the dangerous condition until she examined the hem carefully after the accident. Prior to the repair of the dress, the hem was hanging down for a distance of twenty-two inches. It was not hanging down when it was returned to her room the second time and just before she put it on. Moreover, there was evidence at the time of the trial which indicated plaintiff could not see the length of the stitches without her glasses. It is well established that knowledge of danger or threatened danger will not be imputed to one who is deceived by appearances calculated to deceive an ordinarily prudent person. Nor will knowledge be imputed to a person who fails to look for

danger which under the surrounding circumstances,he had no reason to apprehend. (45 C. J. 950, § 508.) Plaintiff sent the dress back to have the hem fastened. When it was returned the hem was not hanging down. The person fixing the dress owed plaintiff the duty to exercise reasonable care in properly fastening the hem. The presumption was that such duty had been properly discharged and plaintiff was not obliged to anticipate negligence in the repairing of the hem. (20 R. C. L. 117.) Plaintiff testified she relied upon defendant to do the mending in an ordinarily prudent manner. It could not be said, as a matter of law, she was guilty of contributory negligence in failing to inspect carefully that which she had a right to assume would be properly done. (*Upham v. Head*, 74 Kan. 17, 20, 85 Pac. 1017.)

Defendant next urges the demurrer should have been sustained because an accident could not reasonably have been anticipated from the manner in which the hem was fastened. The demurrer was not general but specific in character and the point now urged was not included therein. The question is therefore not properly before us. We might, however, state if plaintiff's evidence was weak or inadequate in this particular, the deficiency was supplied by defendant's own witness, an expert on women's clothing. Rose Givinty, in charge of the alteration department in a Wichita store, previously had been engaged in manufacturing and repairing women's garments. She was asked by defendant's counsel if the bottom of the dress was from eight to ten inches from the floor, whether the length would increase the possibility of plaintiff catching her heel in the hem while descending the stairs. The heels of plaintiff's shoes were described as being approximately two and one-half to three inches tall with small caps. The testimony of the witness was in substance: The longer the dress the greater was the danger of catching it with your heel; the back of the dress lowers as you descend the stairway and you naturally throw your heels back up; if your skirt is of medium length you are likely to throw your heel around the bottom of the skirt and catch it; her own dress was twelve to thirteen inches from the floor and she frequently caught her heel in the hem of the dress; she caught her heel every day in going down stairs; nine times out of ten a woman falling after catching her heel would push the heel clear through the hem; a woman would catch her heel in the hem going down stairs unless the dress was very short. She went up and down stairs in the alteration department fifty times a day;

she even caught her hem when she tried to avoid it; the matter of women catching the hem of a dress with their heels was a frequent incident in her experience.

Plaintiff (appellee) states the trial court refused to instruct on actual agency on the theory it was inconsistent with ostensible agency and she asks us to decide that question in order that the parties and the court may have the benefit of our decision in the event of a retrial. The issue is really not before us. The demurrer was properly overruled if plaintiff's evidence was sufficient upon any theory of agency. The instant appeal is not from instructions but from the ruling on the demurrer. In passing, we may observe plaintiff had the right to plead both actual and ostensible agency in her petition. If either was established it would support a judgment. (*Blewett v. Errickson,* 134 Kan. 690, 694, 8 P. 2d 357.) If a prima facie case was not made on the theory of actual agency, she still had the right to rely upon ostensible agency as pleaded in her petition and reply. Ostensible agency was pleaded in the reply as an estoppel against defendant to deny agency. As to plaintiff, a third party, the distinction between actual and apparent or ostensible agency is really unimportant as the liability of the principal is the same in either case. (*Wilson v. Haun,* 97 Kan. 445, 448, 155 Pac. 798.) If, however, the jury, after hearing defendant's evidence, concluded there was no ostensible agency, then it would have been obliged to determine whether actual agency existed. The jury should, therefore, have been instructed upon that subject. Plaintiff might have endeavored, under the pleadings, to establish only actual agency in her case in chief and might have introduced evidence on ostensible agency only in rebuttal and for the purpose of estoppel. Plaintiff by her pleadings in effect says Lentz was defendant's agent, actually and ostensibly, but if not actually he nevertheless was ostensibly, and defendant is estopped by its conduct to deny agency. In an action of this kind we fail to see how actual and ostensible agency constitute inconsistent positions.

The demurrer to plaintiff's evidence was properly overruled. Ordinarily there is no material difference between a ruling on a demurrer to the sufficiency of evidence and a ruling on a motion for a directed verdict. (*Eckl v. Brennan,* 150 Kan. 502, 506, 95 P. 2d 535.) In the instant case defendant's evidence actually strengthened plaintiff's case in certain particulars. There was competent evidence from which a conclusion could be drawn by the jury in

favor of plaintiff's contention and the motion for a directed verdict was also properly overruled. (*Flentie v. Townsend*, 139 Kan. 82, 30 P. 2d 132.)

The rulings on the demurrer and on the motion for a directed verdict are sustained.