No. 40,611

MARGIE RULE, *Appellant,* v. ETHEL I. CHEESEMAN, Executrix of the Estate of William B. Cheeseman, Deceased, *Appellee.*

(317 P. 2d 472)

Opinion filed November 9, 1957.

*Francis J. Donnelly,* of Kansas City, argued the cause, and *William E. Scott* and *Robert L. Boyce, Jr.,* both of Kansas City, were with him on the brief for the appellant.

*John W. Breyfogle, Jr.,* of Olathe, argued the cause, and *Roy F. Carter,* of Kansas City, Mo., was with him on the brief for the appellee.

The opinion of the court was delivered by

ROBB, J.: A petition was filed and a malpractice action commenced by plaintiff against defendant, as personal representative of her deceased husband's estate, in the probate court where decedent's estate was being probated. The probate court transferred the case to the district court for trial. At the conclusion of the evidence, which was principally by depositions, a motion by defendant for a directed verdict was sustained and the jury so returned its verdict for defendant. Plaintiff appeals from the order sustaining defendant's motion for a directed verdict and from the order overruling her motion for new trial.

After the transfer to the district court no additional pleadings were filed and there was no request to amend them except that the words "servant and employee" were stricken from the petition. The petition substantially alleged that Doctor William B. Cheeseman, a resident of Johnson county, died on January 11, 1955, and that the administration of his estate was pending in the probate court; that on May 4, 1954, Doctor Cheeseman and his agent, Doctor Weaver, acting under and in the scope of the direction of Doctor Cheeseman, negligently and carelessly performed a gall stone operation on plaintiff whereby a gauze pad or surgical sponge was left within her body. This caused plaintiff pain, mental and physical anguish, and suffering. Other allegations involved damages totaling $20,000 including the expense of removing the foreign body.

Defendant, as executrix, filed her answer which was a general denial and also a specific denial of any negligence on the part of decedent in connection with plaintiff's operation.

The cause was submitted to a jury and, as before mentioned, the evidence consisted principally of depositions.

The first deposition offered by plaintiff was that of Doctor B. I. Burns, commissioner of hospitals of Kansas City, Missouri, which included General Hospital No. 1 where plaintiff's operation was

performed; the deposition showed the hospital notes and records of plaintiff while she was a patient in and also an outpatient of the hospital; that Doctor Cheeseman was a staff physician at the hospital and staff physician on plaintiff's case and as such he was the active physician on the visiting or voting staff who supervised the work of residents and internes in the care of patients and who participated in teaching the residents and internes; plaintiff, as were most of the patients, was a charity patient cleared through a welfare agency and Doctor Cheeseman received no pay for his services; a resident is a trainee, not a qualified specialist, but he would be specializing in his field; Doctor Weaver was a resident in surgery, was associated with and assisted Doctor Cheeseman, a qualified specialist in surgery, in the operation on plaintiff; Doctor Weaver was a resident, he was paid for his services from tax money and it was quite probable that he took the lead in the operation because he was far enough along in his training to have been entrusted therewith; the staff man stood over the resident when the resident was permitted to operate; Doctor Weaver was not the surgeon in charge, he was the assistant, although he may have actually done the operating; regardless of a resident's training, the staff member to whom he is assigned is supposed to be present at anything as serious as a gall bladder operation. Doctor Weaver was graduated in June, 1955.

Plaintiff testified that Doctor Cheeseman conversed with her the previous November about the operation and about two or three days before the operation Doctor Weaver and Doctor Cheeseman examined her in the hospital; Doctor Weaver and Doctor Cheeseman were both with her when she was wheeled into the operating room and Doctor Cheeseman had on operating clothes and a mask; throughout plaintiff's stay in the hospital she suffered severe pain and pressure at one end of the incision and she had complained of this to the internes and to Doctor Cheeseman; on December 17, 1954, she had a second operation by Doctor Pollock, whose deposition shows that X-rays had disclosed an opaque mass in the abdomen and the operation had revealed a surgical tape (a pad of gauze) twelve inches square. It is not customary to find such a situation long after surgery.

Plaintiff's sister, who was in plaintiff's room after the operation, testified that during her presence there Doctor Cheeseman was the only doctor who came to plaintiff's room and he was in surgical clothes.

Doctor Weaver's deposition was then introduced by plaintiff. He had not quite finished his third year of residency in general surgery at the time of the operation; Doctor Cheeseman was advisor and teacher to the residents and as such it was not necessary or customary for him to be in the operating room at all times; the witness *doubted* that Doctor Cheeseman was in the operating room; Doctor Cheeseman was advisor and not employer of Doctor Weaver; Doctor Cheeseman supervised or observed the witness in surgery; witness signed his own name and by authority from common usage at the hospital, also signed Doctor Cheeseman's name to many of the reports; Doctor Cheeseman was witness's advisor in a student-teacher relationship; the welfare of the patients was their *joint responsibility*.

At this point in the record plaintiff rested her case, defendant demurred to the evidence, and the demurrer was overruled by the trial court.

Defendant's first witness was Doctor Harry C. Lapp, chief surgeon on the staff of the hospital, who testified to the effect that a gall bladder operation is a major operation and the visiting staff member is usually in attendance or available in the operating room; this depended upon the resident's training and ability as determined by the visiting staff surgeon; the following question and answer were a part of Doctor Lapp's testimony on cross-examination:

"Q. . . . If the visiting staff surgeon is in there and he sees that the resident surgeon in training is doing something wrong, or perhaps not doing it the right way, does he have the authority to take over? A. Well, he would have the authority to take over, yes."

Doctor Marvin Roberts, another resident, testified he was first assistant, Doctor Cheeseman was second assistant, and Doctor Weaver was the surgeon in charge of the operation. The duty of the first and second assistants is to provide exposure in the operating field—to provide an opening by hands or retractors through which the operating surgeon can see the area of the operation.

There was testimony from the witnesses that the nurses, as was the custom, counted the sponges before the operation commenced and a tabulation was made. Before the body cavity was closed the nurses made another count and if it was the same as before, they notified the surgeon to that effect and the opening was closed.

The trial court sustained the motion of defendant for a directed verdict in favor of defendant, directed the jury to bring in its ver-

dict for defendant, discharged the jury and entered judgment for defendant for costs. Plaintiff filed a motion for new trial which was overruled. Plaintiff appealed.

The trial court in sustaining the motion for a directed verdict made quite an extensive statement and we believe it will simplify our discussion if we include the statement here in its entirety:

"Of course, I did have an opportunity to go over these depositions very carefully, and also parts of the record that I thought were material. I actually can't see very much in the status of the case that has changed from when the Court was called to rule on the demurrer to the plaintiff's evidence, but even though most of the factors are resolved in favor of the party against whom a motion for a directed verdict is leveled, nevertheless the real question before the Court is whether or not there is any sufficient evidence that twelve reasonable men and women could find that Dr. Cheeseman was negligent in the performance of his duties as an individual or vicariously under this principal and agent relationship that the plaintiffs have chosen to limit themselves to.

"Now, in the first place, the Court feels that there has been no showing by the evidence that there was ever any undertaking on the part of Dr. Cheeseman to operate on this woman as his patient. Now, at the very most, you have some custom evidence to the effect that it was the custom at the hospital, apparently, to have a staff member on duty when the operation was performed by a resident surgeon, and from all the evidence it appears that he was there in an advisory or consultant status. But even in this case, if we accept the hospital record as true, at the very most Dr. Cheeseman was there, if at all, or at least during part of the operation, as the second assistant. The fact remains that so far as the evidence is concerned, all the evidence indicates that this operation was performed by Dr. Roberts (Weaver?), who was a qualified resident surgeon at the hospital at the time.

"Now, I say plaintiffs have limited themselves in this respect, that you are either going to have to find Dr. Cheeseman was liable as an individual, or under some sort of a vicarious principle that the plaintiffs limited themselves to agency.

"Now, they didn't allege or their theory of this case is not that Dr. Cheeseman permitted an unqualified or incompetent surgeon to perform the operation. Rather, at the most, it is whether or not he, as a staff member, was responsible for any of the acts of the resident surgeon in performing the operation where there is no evidence that he actually took an active part, except at the most maybe as second assistant, or that he was even under a duty.

"Now, there was some indication in the evidence that he could take over if the need arose, but nevertheless, from all the evidence, the relationship there between those people was a staff doctor and resident physician, and who conceivably—although there is no direct evidence to the effect—could have several operations going on at the same time, none of which he was the surgeon on. At most, he was an advisor or consultant.

"From these things I just don't see how, if we let the jury have the case and they bring back a verdict for the plaintiff, there would be any evidence in the

Court's mind that would permit that verdict to stand up under any of these theories. This isn't a *res ipsa loquitur;* if it was, it might be different, I don't know. It isn't a case where you have said that Dr. Cheeseman let an incompetent man go in there. In fact, there is no showing how these resident surgeons are even selected for the operation; and so far as the evidence is concerned in the case, there is really no showing other than that Dr. Weaver was the surgeon on this case, and if there was any physician-surgeon-patient relationship, it would have to be on the part of Dr. Weaver and the plaintiff.

"I am familiar with the questions of agency in the cases that counsel has set out. I agree that there can be a temporary servant relationship, but we are not talking about servants, we are talking about agents, and you can't find any benefit here. As I say, if there was any physician-patient relationship, it was between Dr. Weaver and the plaintiff, and not Dr. Cheeseman; nor was it for his benefit.

"The Court, I might say, is reluctant to take these things away from a jury, but on the other hand, I am duty-bound to apply the law as I see it, and I think it is simply a case where you have sued the wrong man, and that is putting it as bluntly as I know how.

. . . . . . . . . . . . . . .

"In most of these cases, particularly this California case, which incidentally, is a good case, but in most of those cases and many of the others, which I read, you have the question right there of a man that was a surgeon. He was the one that was responsible, and even though there might have been assistants, there was evidence to indicate that there was an actual assistant, and I don't know whether your allegations here are even broad enough in that respect so in view of all of this, I feel, as I say, that I have to apply the law as I see it, and regardless of the sympathies or the difference in stations of life of the parties, there is no question this woman has been damaged because of carelessness on somebody's part, but I feel that it is the Court's duty to take it away from the jury and sustain a motion for a directed verdict on the part of the defendant."

While the trial court apparently found that plaintiff had suffered damage as the result of "carelessness on somebody's part" it is not certain from the rest of its remarks that it determined there was negligence which was the proximate cause of plaintiff's injury and resulting damage. We find a sweeping statement included in an annotation in 162 A. L. R. at page 1299:

"The failure of a surgeon to remove a surgical sponge or other foreign object from the body of a patient following the use of such an object during the course of an open operation constitutes one of those occasions where, by reason of the very nature of the omission, a majority of the courts, although recognizing its general application, have expressly or impliedly refused to apply the otherwise well-established rule that *negligence of a physician will not be inferred or presumed because of an adverse result of medical treatment.*"
(Our emphasis.)

See, also, 70 C. J. S., Physicians and Surgeons, § 62, pp. 990, 991, where a statement of the general rule—that negligence of a physician or surgeon is not presumed, but must be affirmatively proved —and that this is true even though the injury sustained is of an unusual character is made and then the following clear statement is set out:

"It has been held, however, that the fact that a foreign body is left within the body of the patient after an operation is so inconsistent with due care as to raise an inference of negligence, and that plaintiff need not invoke the doctrine of res ipsa loquitur in order to prevail in such a case." (p. 991.)

From a statement in 41 Am. Jur., Physicians and Surgeons, § 97, p. 213, we note that an operation requiring the placing of sponges in the incision is not complete until the sponges are properly removed and it is settled that the leaving of sponges or other foreign substances in the wound after the incision has been closed is at least prima facie negligence by the operating surgeon (*Russell v. Newman*, 116 Kan. 268, 270, 226 Pac. 752, *Bernsden v. Johnson*, 174 Kan. 230, 237, 238, 255 P. 2d 1033) although there are many cases which take the view that such a failure on the part of the surgeon is negligence *per se*. In 41 Am. Jur., Physicians and Surgeons, § 126, p. 236, referring to the burden of proof, is a statement to the effect that the treatment may so plainly indicate that the physician has been negligent as to shift to him the burden of showing, ". . . that the act *prima facie* negligence was not so in fact; for example, the burden of showing care is on a surgeon who leaves a sponge inclosed in a wound after the performance of an operation." See also, *Laughlin v. Christensen*, 1 F. 2d 215, 217. A somewhat recent annotation in 13 A. L. R. 2d at page 84 sets out, along with the rule in other jurisdictions, the rule applicable in Kansas and Missouri.

While it is contended by defendant that plaintiff was a charity patient, we do not believe that fact is determinative of any issues in this case and we will not labor the point. (70 C. J. S., Physicians and Surgeons, § 52, p. 975; 41 Am. Jur., Physicians and Surgeons, § 79, p. 198.) We have here no question of case referral by one physician to another physician, or by a general practitioner to a specialist, or of two physicions or two surgeons acting independently of each other and those situations will not be considered. Much is said about the rule of *res ipsa loquitur* but that, too, is not relied upon either in plaintiff's pleading or the evidence and we will not consider it.

We do, however, have the elements of *respondeat superior*, agency, and primary or joint and several liability alleged in plaintiff's pleading and in the evidence so far as concerns her claim for damages against the estate of Doctor Cheeseman. The trial court in overruling the demurrer, which ruling was not appealed from at the time, nor is it presently the subject of a cross appeal here, found that plaintiff's evidence established a *prima facie* case of negligence on the part of Doctor Cheeseman and whether it was the proximate cause of plaintiff's resulting injury was then a matter for the jury. The ruling on the motion for a directed verdict will be discussed later.

The evidence showed that Doctor Cheeseman, a recognized specialist in surgery, was the first doctor that plaintiff contacted when she began to suffer. Doctor Cheeseman arranged for her entry into the hospital and it should be noted that in addition to what has already been narrated herein from Doctor Harry C. Lapp's deposition, he stated, in substance, that a doctor without hospital connections was unable to get bed care for his patients and a staff member in good standing could get his patients in if there were available beds. Thus it must be a fact that there was a patient-physician, or patient-surgeon relationship between plaintiff and Doctor Cheeseman which continued through such time when the actual operation was commenced and after she was returned to her room. Doctor Cheeseman was the only doctor to visit plaintiff in her room and he came in while still attired in his operating clothes.

It is admitted that the evidence is somewhat conflicting on what actually took place in the operating room. Plaintiff, who was under anaesthetic, could not testify as to what happened and Doctor Cheeseman is deceased. Doctor Roberts was there and he placed Doctor Cheeseman present in the room as a second assistant in helping to keep the operating field open by using hands or retractors. The two nurses present testified only to the sponge count. Then we have Doctor Weaver's deposition (part of which is relied on by defendant) where he stated that he *doubted* that Doctor Cheeseman was in the operating room at all times. This testimony cannot be considered as conclusive in the form in which it is stated even from an expert. We cannot agree with the defense or the trial court in their respective theories based solely on Doctor Weaver's testimony that Doctor Cheeseman was not there all the time or that Doctor Cheeseman could have had several operations going on at the same

time on none of which would he have been the surgeon. Once Doctor Cheeseman became plaintiff's physician or surgeon (here also a specialist) he remained in that capacity, so far as plaintiff was concerned, as long as he took part in her treatment. This included her pre-operative care, both before and after entering the hospital; his presence with Doctor Weaver during her pre-operative examination in the hospital; his accompanying her into the operating room; during the period of the operation, when he was the only specialist-surgeon present and he acted as second assistant and as supervisor, teacher, advisor, or consultant with authority to take over if something was done wrongly by Doctor Weaver; and during the post-operative care of plaintiff, when he visited her room while still in his operating clothes. Doctor Cheeseman made subsequent visits to the patient at which time she complained of suffering severe pain, a full feeling, and of pressure at one end of the incision but he failed to examine plaintiff and to discover the foreign substance that was later discovered and removed by another surgeon-specialist. In other words, there was not the slightest break in the relationship of patient and surgeon between plaintiff and Doctor Cheeseman during the time when she first saw him in November, 1953, until she contacted Doctor Pollock the following December, as reflected in the record. Plaintiff was entitled to have the question of the existence of the patient-surgeon relationship between her and Doctor Cheeseman submitted to the jury as a fact question. (70 C. J. S., Physicians and Surgeons, § 63, pp. 1010, 1011.)

Attention is directed to the case of *Baird v. National Health Foundation,* 235 Mo. App. 594, 144 S. W. 2d 850, where there is an exhaustive treatment of a malpractice case against multiple defendants, three of whom were doctors who saw the patient at successive times. All three were held to be jointly and severally liable. (pp. 607-609.)

Doctor Cheeseman did not hold himself out to the public merely as a surgeon with the duty to use reasonable skill and care for the safety and well-being of his patient (41 Am. Jur., Physicians and Surgeons, § 79, p. 198) but he held himself out to the public as a *specialist* in surgery and he, therefore, as a matter of fact had a common law duty to bring the skill and care of such a *specialist* to plaintiff as his patient. (41 Am. Jur., Physicians and Surgeons, § 90, p. 208.) It is impossible to conclude under this record *as a matter of law* that Doctor Cheeseman used such degree of skill and care in his treatment of plaintiff as his patient.

We will pause here to note the evidence and contention, or attempt of defendant to relieve Doctor Cheeseman of liability by showing that the nurses kept the sponge count. This seems to avail him little, if anything, because the sponge was found at the point of the operation and there was nothing in the record to dispute this fact. It remains a question of fact for the jury to decide. In other words, a count of sponges by a nurse before and after an operation is not conclusive. (*Laughlin v. Christensen*, supra, p. 217.) This appears to be the majority rule and is stated in more detail in 41 Am. Jur., Physicians and Surgeons, § 97, p. 214.

By reason of what has been said we think it is unnecessary to go into the elements of *respondeat superior* and agency. However, we are not here determining whether those elements are in the case.

From the record and the authorities, it appears that plaintiff had the right to have Doctor Cheeseman's acts submitted to the jury for its determination as to whether his acts constituted negligence and were the proximate cause of plaintiff's injury or resulting damage, and whether his was a primary liability. (*Russell v. Newman*, 116 Kan. 268, 270, 271, 226 Pac. 752; *Baird v. National Health Foundation*, supra.) The trial court held that *someone was negligent* but plaintiff had sued the wrong man. Taking that view of the evidence raises the question whether Doctor Cheeseman was jointly and severally liable with Doctor Weaver. The decisions in the Russell and Baird cases state that question is one for the jury to decide.

On the question as to whether the trial court erred in refusing the introduction of evidence by plaintiff in the form of a mimeographed copy of the constitution and by-laws of the visiting staff of General Hospital, it is sufficient to say that from the record before us we are unable to see any probative value in exhibit 4 in this case, as between plaintiff and the executrix of Doctor Cheeseman's estate, and we think the trial court was correct in rejecting admission of exhibit 4 into evidence.

In addition to what has previously been said as to the trial court's sustaining of the motion for a directed verdict after overruling the demurrer to the evidence, we are presented with incompatible rulings. In an earlier malpractice case (*Stout v. Bowers*, 97 Kan. 33, 154 Pac. 259), former Chief Justice Johnston, speaking for the Court, stated:

"If the demurrer to plaintiff's evidence could not be sustained a verdict against her could not be directed, because of conflicting evidence subsequently

produced in behalf of the defendants. Her case might have been strengthened by the testimony offered in their behalf, but on the motion to direct a verdict the *prima facie* case made by her testimony could not be weakened or destroyed by theirs." (p. 36.)

On this same point see, also, *Flentie v. Townsend,* 139 Kan. 82, 88, 30 P. 2d 132, (a malpractice case) and *Mathis v. Public School District No. 103,* 175 Kan. 453, 264 P. 2d 1082, where it was said:

"As in the case of a demurrer evidence against which a defendant directs a motion for a directed verdict must be construed in the light most favorable to the plaintiff and against the defendant." (Syl. ¶ 2.)

In view of what has been said we will not discuss further the statement of the trial court when making its order sustaining the motion for a directed verdict. The judgment cannot stand for the reasons stated and it must be reversed and the case remanded with instructions that the trial court grant a new trial and proceed therewith in accordance with this opinion.

It is so ordered.

PRICE, J., dissenting: No one will deny the existence of negligence in this case, but in my opinion the trial court was correct in holding that it is simply a case in which plaintiff sued the wrong man.

PARKER, C. J., concurs in the foregoing dissenting opinion.