No. 36,238

Robert H. Ferguson, *Appellee*, v. The Kansas City Public Service Company, *Appellant*.

(156 P. 2d 869)

Opinion filed March 10, 1945.

*Thos. M. Van Cleave,* of Kansas City, argued the cause and *Edwin S. Mc-Anany,* of Kansas City, and *Charles L. Carr,* of Kansas City, Mo., were on the briefs for the appellant.

*Walter G. Klamm,* of Kansas City, argued the cause, and *Paul L. Thomas* of Kansas City, and *J. K. Owens* of Kansas City, Mo., were on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: This was an action for damages for personal injuries. The jury returned a verdict for plaintiff for $1,000 and answered special questions, which found that plaintiff caused or contributed to his injury. Plaintiff moved to set aside the special questions as not supported by the evidence. This motion was not

presented to the court. Plaintiff also filed a motion for a new trial on formal statutory ground. Defendant filed a motion for judgment on the answers to the special questions notwithstanding the general verdict. These two motions came on for hearing together. The trial court took the view that the answers to the special questions were in conflict with the general verdict and that this indicated the jury was confused, and for that reason concluded the fair thing to do was to grant a new trial. Plaintiff's motion for a new trial was sustained and defendant's motion for judgment on the answers to the special questions was overruled. Defendant has appealed and contends that the court erred (1) in overruling its demurrer to plaintiff's evidence, (2) in overruling its motion for judgment on the answers to the special questions notwithstanding the general verdict, and (3) in granting a new trial.

In his petition plaintiff alleged that on a day stated he was a passenger on defendant's streetcar, its route being in a westerly direction on Minnesota avenue in Kansas City; that he alighted from the front end of the car and stepped into a safety zone at Third street and Minnesota avenue; that the safety zone was marked and designated as a place for passengers from the streetcar and pedestrians to stand in order to be safe from being struck by streetcar or automobile traffic; that plaintiff stepped from the front door of the car into the safety zone, and while standing in the north end of the safety zone the streetcar from which he had alighted was so negligently operated by defendant that the rear end of the streetcar swung around and struck him, knocking him down to the pavement, and that by reason of the negligence of defendant and its employees plaintiff received injuries, which were stated, to his damage in a sum named. In its answer defendant admitted its corporate existence and that it operates a transportation system in Kansas City and denied all other allegations of the petition; and further alleged that if plaintiff received injuries at the time and place alleged, such injuries were caused by plaintiff's negligence, or that his negligence directly contributed thereto. The reply was a general denial.

There is surprisingly little controverted evidence in the case. The locale of the alleged injury may be described as follows: Minnesota avenue in Kansas City is the main east-and-west street, a traffic thoroughfare. It is intersected at right angles by Third street. Each street is paved. Minnesota avenue is paved 68 feet wide west of Third street and 56 feet wide east of Third. East of Third street

Minnesota avenue continues east to the Fairfax industrial district; also a short distance east of Third street a paved street veers from Minnesota avenue to the southeast and becomes the entrance to the intercity viaduct between Kansas City, Kansas, and Kansas City, Missouri. Third street is paved 52 feet wide north of Minnesota avenue and 56 feet wide south of Minnesota. About 200 feet south of Minnesota a street, paved 44 feet wide, veers to the northeast, connecting with the approach to the intercity viaduct. There is a triangular area northwest of the 44-foot street last mentioned, east of Third street and south of Minnesota avenue, the north and west lines of which are about 40 feet long. This is curbed and has around the outer edge of it a cement sidewalk 3½ feet wide. It is spoken of as an island. Defendant's street railway tracks are double on Third street south of Minnesota avenue and turn west at the intersection of Minnesota and Third street. The east track on Third street is for northbound cars, which at the intersection turn west on Minnesota avenue. Adjoining the east rail of this track, beginning about 10 feet south of Minnesota avenue and extending south 49 feet on Third street, is a marked safety zone about five feet wide abutting the east rail of the track on its west side and marked on the east with a white painted line eight inches wide, with a similar line at each end of the safety zone. At the north end of the safety zone are metal buttons five inches high and eighteen inches in diameter. The distance between the east edge of the white line of the safety zone and the curb of the island to the east of it is 16 feet, 4 inches. On Third street south of Minnesota avenue the northbound vehicular traffic moves on the east side of Third street and the southbound vehicular traffic on the west side. There are stop signs on Third street at Minnesota avenue. The street railway's line above described is known as the "City Park" line. The rails of the track on this line are 4½ feet apart. The streetcars used on it are about 44 feet long, with a door at each end for ingress and egress and are 8½ feet wide but narrowed at the rear vestibule to 7½ feet wide. The overhang of the car over the tracks on the street is two feet on each side of a straight track, but in making a turn the rear overhang is almost four feet near the north end of the safety zone. The greatest overhang would leave 14 inches of the safety zone clear at the north end of the safety zone and for perhaps four feet south of that, and a greater distance farther to the south.

Plaintiff was about seventy years of age at the time of his injury.

His testimony may be summarized as follows: He had resided in Kansas City 23 years. His business was manufacturing and selling a line of medical preparations for the treatment of the feet, also for the treatment of colds and sinus trouble in the head. He had these on sale at various places in the city. It was his custom to go to the industrial centers at the noon hour to sell his preparations to the workmen, and later in the day he would make the business places. He "was a perfect specimen of manhood," strong, able-bodied, worked seven or eight hours a day and could have worked that much longer. He had ridden the streetcars ever since he had lived in Kansas City, more frequently on the city park line than on any other. He was familiar with the type of streetcar then in use and which had been used on that line for about ten years, and had ridden them many times; was familiar with the doors and steps of the cars and the method used by the operator in opening and closing the door when a passenger alighted. He had alighted from the car many times—from the front or rear door, whichever was the most convenient—but had not previously alighted at the front door at the stop in question. On the day in question he boarded the car at Tenth and Main in Kansas City, Mo., and reached Third and Minnesota at 10:45 a. m. He indicated his desire to get off and the operator stopped the car at the usual stopping place, the front door being a few feet south of the north end of the safety zone. The operator opened the door and plaintiff got out and stepped down on the pavement. He was clear of the car. The operator closed the door and started to move on. Plaintiff started to go across the street to the island to catch a bus to go to the Fairfax industrial district. He testified that he knew if he stood in the safety zone just where he alighted from the car that he probably would be struck by the overhang of the rear end of the car as it rounded the curve onto Minnesota avenue; that he stepped to the east edge of the safety zone, but that his way to go over to the island was blocked by a truck which had stopped for the intersection and which was apparently stalled, the driver of which was stepping on the starter button, having some difficulty getting it started. In his testimony he said the west edge of the truck was three or four feet east of the east edge of the safety zone. There was no vehicular traffic on the street at the time except the stalled truck and a truck standing back of the streetcar, to which the plaintiff paid no attention. He stood on the east edge of the safety zone watching the truck in front of

him. He knew the streetcar had started and was moving. He was facing east, looking ahead of him, when he was struck by the rear end of the streetcar and thrown to the pavement toward the east, falling in part under the truck in front of him. He backed out and got up, the truck in front of him moved on, the streetcar did not stop, but the driver of the truck back of the car drove up and spoke to him. He did not know he was seriously injured, and went on over to the island and caught a bus to the Fairfax district. Finding himself not feeling well in the afternoon it was necessary for him to go home, and he later called a doctor. Within a short time thereafter he presented a claim to defendant. Plaintiff was the only witness in his behalf as to how the accident occurred, his only other witness being the physician who had treated him.

Defendant's demurrer to plaintiff's evidence was overruled and it called as its first witness Roy Russell, the only eyewitness to the accident other than plaintiff. He testified that he was a laborer, following the construction line; that he was driving his small Ford truck going after tools, traveling north on the right-hand side of Third street. He stopped his truck about a car length behind the streetcar. There was another truck in the street, apparently stalled, the front end being almost as far north as the north end of the safety zone, the right wheels of which were about two feet west of the east curb of the street. The witness thought of driving through and estimated that he had room to drive between the stalled truck and the safety zone, but he did not attempt to do so because there was a man (plaintiff) standing in the street. He saw plaintiff get off the car onto the pavement, but did not watch his movements all the time. He knew the streetcar had started and when he looked up again the plaintiff was on all fours getting up and the stalled car had moved on. The witness drove up to plaintiff and inquired if he was hurt. Plaintiff answered, "No, but I am jarred up pretty well," or "I may not be hurt, but I am pretty badly shook up."

Other evidence produced by defendant was to the effect that no officer or employee of defendant knew of the accident until several days later, the exact time not shown, when plaintiff filed a claim with defendant for injuries as a result thereof. Among other things defendant called in the operators of its streetcars on the City Park line which by the time sheet were at the Third street and Minnesota avenue stop about the time and shortly before and soon after plaintiff fixed the time of his injury. Three of these operators

testified, one whose car was at that point at 10:36 a. m., another at 10:46, and another about 10:57. Plaintiff had fixed the time at 10:45 a. m. Each of these operators testified that he knew nothing of any accident at that intersection on the day in question, that he had no recollection of plaintiff riding with him that day, or of who if anyone alighted from the streetcar at that stop. Their testimony disclosed that the streetcar is equipped with a mirror so situated that the operator of the car can look into it and see anyone near the car for the full length of its side. They stated their practice was that when a passenger alighted to be sure he was clear of the step before the door was closed, and they looked into the mirror to see that whoever alighted was clear of the car and had ample space to walk away from it across the street to the sidewalk before starting the car; that at this particular intersection there was not only a curve in the track, but an upgrade and traffic which it was necessary to watch as the car moved into Minnesota avenue and turned west, and that they used their best efforts to see that their car did not collide with any other vehicle or pedestrian. They further testified that when a passenger alighted and was clear of the step it took about two seconds to close the door and about two seconds additional to release the brakes, and that the next thing done was to apply the power to move the car. This was done so that the car would move slowly, and that it would take from ten to twenty seconds, depending upon conditions, for the car to move its length, about 44 feet, and that the speed was increased as the car moved forward. Their testimony disclosed that the day was dry and sunny. There was also medical evidence, but we need not go into that.

Defendant called as a witness the city clerk, who produced the traffic ordinance of the city, passed in 1931 and still in force, the pertinent section of which reads:

"The commissioner of streets is hereby empowered to. establish safety zones and lanes for traffic of such kind and character and at such places as he may deem necessary for the protection of pedestrians."

and designating how a safety zone at a street car stop shall be marked. There is no contention that the one at Third and Minnesota was not properly marked. The witness had no personal knowlededg as to who established or maintains the safety zone at that point, but did know that the street commissioner and the city engineer have established and maintain safety zones at various places in the city.

Defendant's motion for a peremptory instruction in its favor was overruled. The court gave the jury an instruction which, among others, defined contributory negligence, and told the jury that if it found that plaintiff's injury resulted from his own negligence, or if his own negligence contributed to his injury, that its verdict should be for defendant. Respecting special questions submitted the court instructed the jury as follows:

"In addition to your general verdict, you will answer each of the special questions as you find the facts to be from the evidence bearing thereon, regardless of what your general verdict may be or the effect of your answers thereon. Sign your answers at the end of your series by your foreman, and return them into Court."

In addition to the general verdict for plaintiff the jury answered special questions as follows:

"1. How many feet east of the east line of the safety zone would plaintiff have had to step to avoid being struck by the swing of the street car? A. None.

"2. Was there anything to have prevented plaintiff from stepping a few feet east beyond the east line of the safety zone and thereby have avoided being struck by the outward swing of the street car? A. No.

"4. State what distance the left front wheel of the stalled truck headed north on Third Street, referred to in evidence, was from the east curb of Third Street. A. 6' 8".

"5. Did plaintiff, from the time he left the street car and started toward and stopped on or near the east line of the safety zone, keep any lookout for the overhang of the street car as it rounded the curve from Third Street into Minnesota Avenue? No.

"6. How many seconds in time after plaintiff had alighted from the street car did it take the operator of the street car to (a) close the door and raise the front step? (b) then turn the lever and start the car in motion? A. (a) 2 seconds. (b) 2 seconds.

"7. After the car had started from the point where plantiff alighted, state (a) at what average rate in miles per hour did it travel to the point where it struck plaintiff; (b) how many feet did the car travel before it struck plaintiff? (c) how long in seconds did it take the rear end of the street car to reach the point where plaintiff alighted? A. (a) 1 to 1½. (b) 40 ft. (c) 10 seconds.

"8. State specifically each injury the plaintiff suffered that has diminished his ability to carry on his work. A. Bruises and shock to the nervous system.

"9. If you find for plaintiff, state specifically each negligent act of defendant's operator that caused or contributed to his injury. A. Operator failed to use outside rear view mirror while rounding the curve.

"10. State whether or not plaintiff took reasonable care and precaution for his own safety after he alighted from the street car. A. No."

Plaintiff moved to set aside the answers made by the jury to all

special questions for the reason that the answer to each of them is contrary to the evidence, is unsupported by the evidence, is inconsistent with the general verdict, in addition is contradictory and inconsistent with one another, and shows bias, prejudice and passion on the part of the jury. This motion was not presented to the court to be ruled upon and may be regarded as having been withdrawn. Plaintiff also filed a motion for a new trial upon the formal statutory grounds. Defendant filed a motion for judgment in its favor on the special findings of the jury notwithstanding the general verdict for the reason that under the facts as found by the jury the plaintiff is not entitled to recover. The court denied defendant's motion for judgment and granted a new trial, and in doing so gave reasons as follows:

"The jury found both ways on this question of contributory negligence. In their general verdict they found that the defendant was guilty of negligence, and the plaintiff not guilty of contributory negligence. Under the instructions that is the only way they could find. . . . And then on question 10 they answered it in a way that amounts to saying he was guilty of contributory negligence.

"They said he took no reasonable precautions, which probably means the same thing, although I doubt if the jury meant that. I think the jury meant he did nothing—he just stood there. He didn't do anything. What was there to do? He was in the safety zone, and he probably assumed he was safe. And that is what the jury meant. And yet, looking at it from the defendant's standpoint, it sounds as if the jury found he was guilty of contributory negligence. But that is unreasonable, because they had already found he was not guilty of contributory negligence. I think the jury was confused. And I think the fair thing to do will be to try the case again. The plaintiff's motion will be sustained, and a new trial granted."

We turn now to the consideration of the legal questions involved.

A safety zone in a highway established under our statute relating to traffic in the highways (G. S. 1943 Supp. 8-501, definition of "Vehicle" and "Safety Zone," also 8-563 and 8-572) and under the traffic code ordinance of Kansas City, is designed to provide a place in the traveled portion of the highway or street for the safety of pedestrians from vehicular traffic. The point heavily labored by plaintiff and referred to by the trial court, that plaintiff had reason to consider himself safe from the overhang of the streetcar in the safety zone, is not well taken. The overhang of the streetcar is about two feet on a straight track. This would cover two-fifths of the safety zone in question. On the curve toward the north end of the safety zone the overhang is practically twice that. These were

facts well known to the plaintiff. We think the fact that there was a safety zone at the place where the plaintiff alighted has little, if any bearing upon the question of his relation to the streetcar company.

An adult passenger on a streetcar who is in possession of his normal faculties and apparently capable of taking care of himself after he gets off a streetcar, and who alights safely from the streetcar at a point where there is no traffic on the street, or anything else to interfere with his movements or to prevent him from stepping away from a place where he might be struck with the overhang of the streetcar, has ceased to be a passenger of the streetcar company and has become a pedestrian in the street. A streetcar company as a carrier has no further duty to him which is any greater than it has to any other pedestrian in the street. The general rule is well stated in 60 C. J. 443, where it is said:

"The obligations of a street railway company to a person as a passenger having ended when upon alighting he has reached a place of safety on the road, the company's liability for personal injuries caused by it immediately thereafter must be based upon its obligations to individuals lawfully upon the street."

Many other authorities may be found to support this view. See, also, 13 C. J. S. 1074, and 10 Am. Jur. 54, § 1008.

A streetcar runs on tracks and as it moves along the street cannot change its course from right to left as an automobile or truck can do. That there is a normal overhang of the streetcar on a straight track and a greater one as it rounds a curve are facts so well known that the courts take judicial knowledge of them.

But here we need not depend upon general or judicial knowledge. The plaintiff's testimony clearly disclosed that he was familiar with those facts. The general rule pertaining to the duty of pedestrians or drivers of vehicles on the street with respect to the normal overhang of a streetcar and its greater overhang as it rounds a curve is well stated in 25 R. C. L. 1245 as follows:

"The rule approved by the weight of authority is that in view of the well known fact that in rounding a curve the rear end of a streetcar will swing beyond the track and overlap the street to a greater extent than the front, the motorman may rightfully assume that an adult person standing near the track who is apparently able to see, hear and move, and having notice of the approach of a streetcar and of the existence of the curve, will draw back far enough to avoid being struck by the rear of the car as it swings around the curve in the usual and expected manner, and, therefore, no legal duty is imposed upon the motorman to warn such a person against the possible danger of a collision with the rear, because of the swing, if he remains in the same position.

Every driver of a vehicle must know that the motorman cannot control the hind end of the car at a curve so as to keep it from swinging out as far as, by nature, it will go. It is therefore incumbent upon the driver of a vehicle passing a streetcar to keep out of the way, and at curves to drive farther from the car than at other points. A street railway company is under no obligation to keep a lookout to prevent persons from coming in contact with the rear end of a car in rounding a curve. This rule applies to persons leaving a car and to those intending to become passengers."

The duty of the operator of a streetcar after a passenger alights safely in a place where he has ample room to step away from the overhang of a streetcar, and who has to go forward around a curve into another street where there is normally heavy traffic, is to give his attention primarily ahead of him to see that he negotiates the curve through such traffic as there may be without collision with others who are using the street. It is true that he might glance in his rear vision mirror to see whether there is any pedestrian or vehicle so close to his car that such person or vehicle might be struck, but unless there is reason to suspect such a situation he has no duty to do so.

In *Steinburg v. Milwaukee E. R. & L. Co.*, 222 Wis. 37, 266 N. W. 793, it was held:

"Where a passenger after alighting from the front exit of a streetcar on an open street with at least five or six seconds to reach a place of safety, which he could have done by taking two or three short steps, was struck by the rear end of the car which swung outward as the car rounded a curve, the evidence as to whether the motorman, who was in sole charge of the car, was negligent in moving the car forward before the passenger was beyond the maximum overhang of the car is held insufficient for the jury.

"After the passenger was safely off the streetcar and afforded a reasonable opportunity to walk to a place of safety, the motorman, who was in sole charge of the car, had a right to assume that the passenger would withdraw far enough to avoid being struck by the rear end of the car as it swung around the curve in the usual manner.

"After the passenger had safely stepped from the streetcar and the car was started, the motorman was not under a duty to look to the rear for the purpose of observing whether the passenger was in a position so close to the car as to be in danger of being hit by the overhang thereof as the car swung around the curve in the usual manner." (Syl. ¶¶ 3, 4, 5.)

The opinion discloses facts quite similar to those presented here and quotes with approval from *Ryan v. Milwaukee Northern R. Co.*, 186 Wis. 537, 203 N. W. 340, as follows:

" 'Since it was necessary for the motorman to keep close watch forward, we do not consider that he was also required to look constantly to the rear to avoid such a collision as occurred. The law does not impose any such responsibility.' "

Our own decisions are in harmony with those above referred to. In *Weir v. Railways Co.*, 108 Kan. 610, 196 Pac. 442, it was held:

"A motorman on a streetcar may rightfully assume that an adult pedestrian apparently capable of taking care of herself, who is walking in the wagonway between the track and the curbing, a space of about six feet, and not near enough to the track to be struck by the forward end of the car, will step aside far enough to avoid being struck by the overhang of the car as it rounds a curve which they were approaching and of which she was aware." (Syl. ¶ 2.)

See, also, *Senning v. Interurban Railway Co.*, 101 Kan. 78, 165 Pac. 863, and *Kern v. Kansas City, L. & W. Rly Co.*, 125 Kan. 506, 264 Pac. 1067, and authorities there cited. The Steinburg case, *supra*, and the Weir case, *supra*, and many other cases to the same effect, were cited and followed in *Miller v. Utah Light and Traction Co.*, 96 Utah, 369, 86 P. 2d 37.

In view of the legal principles above stated and the authorities on which they are based we are unable to see that the evidence in this case established any negligence of the defendant.

The court submitted to the jury special questions designed to elicit findings by the jury pertaining to the negligence of the defendant or of the plaintiff. In answer to question No. 9 the jury found the only negligence of defendant was that its operator "failed to use outside rear-view mirror while rounding the curve." Under the authorities above set out and the facts of this case the operator of the streetcar was under no duty to plaintiff to watch his movements through the mirror. His duty was to see that he rounded the curve and proceeded through the intersection without contact with traffic or pedestrians therein. So, as a matter of law, this finding does not convict defendant of actionable negligence.

Other questions asked and answered bear more directly upon the negligence of plaintiff. Answering question No. 1, the jury found that plaintiff would not have had to step as far as one foot east of the east line of the safety zone to have been in a place of safety. In answer to question No. 2 they found there was nothing to prevent him from stepping a few feet east of the east line of the safety zone. By answer No. 4 they found that the left wheel of the stalled truck was 6 feet 8 inches west of the east line of the street. The distance from the east line of the safety zone to the curb on the east side of the street was 16 feet 4 inches. This again demonstrates that plaintiff had plenty of room to step away from the overhang of the car. Answering question No. 5 it was found that plaintiff kept no lookout for the overhang of the

streetcar as it rounded the curve. Answering questions 6 and 7 the jury found that as much as 14 seconds elapsed after the plaintiff alighted from the streetcar before he was struck, and establishes that he had ample time to get away from the streetcar. And answering question No. 10 the jury specifically found that plaintiff did nothing for his own safety. These findings clearly demonstrate that plaintiff's injury resulted from his own negligence.

An examination of the record discloses that these questions are all sustained by ample evidence. Indeed, there is no conflicting evidence bearing on the question except as to the distance of the standing truck east of the east line of the safety zone. Plaintiff testified that the west line of the truck was three or four feet east of the east line of the safety zone. (Upon his cross-examination it was brought out that at an earlier trial of the case he had given this distance as six or seven feet.) The witness Russell testified that after careful estimation he concluded that he could drive his truck between the standing truck and the safety zone and the reason he did not do so was that there was a man standing in the street. Plaintiff moved to set aside the answers to these questions as not being sustained by the evidence, but either that motion was not submitted to the court or it was denied *cum silentio*. In considering defendant's motion for judgment on the answers to the special questions, and at the same time considering plaintiff's motion for a new trial, the trial court treated the answers to the special questions as being sustained by the evidence; otherwise, it could have found no conflict between them and the general verdict. It seems clear to us that defendant's motion for judgment upon the answers to the special questions should have been sustained.

The trial court granted plaintiff a new trial, not for any reasons set forth in his motion for a new trial, but upon the ground that the general verdict of the jury for the plaintiff of necessity contained within it a finding that plaintiff was not guilty of negligence which caused or contributed to his injury, while the answers to the special questions clearly constitute a finding that plaintiff was guilty of negligence which caused or contributed to his injury.

Normally when a court grants a new trial the effect of it is not only to set aside any general verdict which has been returned by the jury, but also to set aside the special questions. In such a situation it is normally held that there no longer exists any special questions upon which judgment can be rendered for defendant. (See

*Lapo v. Naillieux,* 138 Kan. 99, 102, 23 P. 2d 500, set aside on rehearing, 139 Kan. 23, 29 P. 2d 1093.) We think this rule is not applicable here because the trial court stated the specific reason which prompted him to grant the new trial. This court has been quite liberal with trial courts in not interfering with an order granting a new trial where no particular reason for granting it is stated, or several reasons are given by the trial court, but it has been repeatedly held that when the trial court specifically states its reasons for granting a new trial this court may examine the question to see whether the reasons given, as a matter of law, justify the granting of a new trial.

In *Lindh v. Crowley,* 29 Kan. 756, it was said:

"Where a motion is made for a new trial and the trial court sustains the motion for a manifestly insufficient reason, and it does not appear from the record brought to the supreme court that there was any sufficient reason for granting a new trial, the order of the trial court granting the new trial will be reversed." (Syl. ¶ 3.)

See, also: *Johnson v. Town Co.,* 7 Kan. App. 134, 53 Pac. 87; *A. T. & S. F. Rld. Co. v. Brown,* 51 Kan. 6, 32 Pac. 630; *Sovereign Camp v. Thiebaud,* 65 Kan. 332, 69 Pac. 348; *Railroad Co. v. Werner,* 70 Kan. 190, 78 Pac. 410; *Sutter v. Harvester Co.,* 81 Kan. 452, 106 Pac. 29; *Thompson v. Seek,* 84 Kan. 674, 115 Pac. 397; *Ahlstrom v. Kansas Milling Co.,* 85 Kan. 548, 118 Pac. 57.

In *Atkinson v. Darling,* 107 Kan. 229, 191 Pac. 486, the rule is thus stated:

"Ordinarily no reversible error can be based upon the granting of a new trial unless the trial court indicates the exclusive and specific ground upon which the new trial is granted, and unless that ground happens to be one which the supreme court is in as good a position to consider and determine as the trial court." (Syl. ¶ 2.)

And see, also, *Bowers v. Carlson,* 139 Kan. 396, 32 P. 2d 246.

The case before us falls within this class. So we are confronted with the question as to whether the reason given by the trial court for granting a new trial was legally justified. The pertinent portion of our statute (G. S. 1935, 60-2918) reads:

"In all cases the jury shall render a general verdict, and the court shall in any case at the request of the parties thereto, or either of them, in addition to the general verdict, direct the jury to find upon particular questions of fact, to be stated in writing by the party or parties requesting the same. . . . *When the special finding of facts is inconsistent with the general verdict, the former controls the latter, and the court may give judgment accordingly.*" (Emphasis ours.)

In this case special questions were properly submitted to the jury and the court properly instructed the jury that it should answer the special questions as they found the facts to be without regard to the effect their answers might have on the general verdict. It is not infrequent, as many of our cases disclose and as the statute evidently contemplated might be true, that the special findings of fact are in conflict with the general verdict, and the legislature provided which should control in such an event. The statutory provision is that the special findings shall control, and that has been the repeated holding of this court. (See the many cases on this point annotated under the statute.) A conflict between the special findings of fact and the verdict is not given in our statute as one of the grounds for granting a new trial. Indeed, the statute provides for the contrary, namely, that the judgment should be rendered on the special findings of fact. We think it is as novel as it is unsound to grant a new trial for the reason that there is a conflict between the findings of fact made by the jury and the general verdict.

The result is that the ruling of the court in granting a new trial in this case cannot stand. The findings of fact returned by the jury, being sustained by the evidence and so treated by the trial court, which in fact approved them as being sustained by the evidence, must control the judgment therein entered.

Upon the whole we are convinced that the defendant's demurrer to the evidence should have been sustained, that defendant's motion for judgment upon the findings of fact notwithstanding the general verdict should have been sustained, and that the court erred in granting a new trial. The result is that the judgment of the court below must be reversed with directions to enter judgment for defendant. It is so ordered.

SMITH, J., dissents from paragraphs 1 and 2 of the syllabus and the corresponding portions of the opinion.