No. 38,789

Louise Bernsden, *Appellant*, v. Dr. C. N. Johnson, *Appellee*.

(255 P. 2d 1033)

Opinion filed April 11, 1953.

*Clyde M. Simon*, of Wichita, argued the cause, and *P. J. Warnick* and *C. C. Counts*, both of Wichita, were with him on the briefs for the appellant.

*Malcolm Miller*, of Wichita, argued the cause, and *George Siefkin, George B. Powers, Samuel E. Bartlett, Carl T. Smith, John F. Eberhardt, Stuart R. Carter* and *Robert C. Foulston*, all of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

Wertz, J.: This is an appeal from an order entered by the court below sustaining appellee's motion for a new trial setting aside the verdict of the jury and granting a new trial on the ground that the expert testimony introduced in the case was was not sufficient to sustain the verdict of the jury.

Appellant Louise Bernsden will be hereinafter referred to as plaintiff, and appellee Dr. C. N. Johnson, as defendant.

The action was one for malpractice alleging that defendant was negligent in allowing a breathing tube to become lodged in the plaintiff's throat, and in failing to discover such condition for a period of about thirty-six hours.

The sole question involved in this case is whether the trial court erred in granting defendant a new trial on the specific ground that the expert testimony introduced was not sufficient to sustain the verdict.

A complete review of our decisions on the power of the trial court to grant a new trial is not necessary. It is a well-settled rule in this state that the granting or denying a new trial is largely within the discretion of the trial court. Many cases might be cited that the trial court not only has the power but the duty to set aside a verdict and grant a new trial if it is not satisfied with the verdict. However, if the trial court indicates the exclusive and specific ground on which the new trial was granted, and that ground is one which this court can deal with as readily as the trial court, we examine the question to see whether the reason given, as a matter of law, justifies the ruling made. (*Ferguson v. Kansas City Public Service Co.,* 159 Kan. 520, 156 P. 2d 869; *Bateman v. Roller,* 168 Kan. 111, 113, 211 P. 2d 440; *Fralick v. Kansas City Public Ser. Co.,* 168 Kan. 134, 211 P. 2d 443; *In re Estate of Lightfoot,* 163 Kan. 369, 372, 182 P. 2d 887; *Atkinson v. Darling,* 107 Kan. 229, 191 Pac. 486.)

The instant case falls within the latter class, so we are confronted with the question whether the reason given by the trial court for granting a new trial was legally justified. A brief résumé of the testimony is as follows:

Plaintiff testified, in the early morning of February 23, 1949, she took suddenly ill and called Dr. C. N. Johnson, defendant, to her home. He made a cursory examination and diagnosed her condition to be a severe abdominal hemorrhage. Being an emergency case, he directed hospitalization. It was necessary to perform an operation immediately to put a stop to the hemorrhage, and as a part of such operation, which was performed at 5 o'clock that afternoon, he removed an ovarian cyst. Just prior to the operation the defendant introduced Dr. James H. Adams to the plaintiff and advised her that he would administer the anaesthetic. He immediately put the mask over her face and she became unconscious. As she

regained consciousness after the operation she was choking, was in great pain, and was unable to sleep all that night. The next morning, defendant came to see her. She was suffering pain in her throat, it was terribly sore and something was strangling and choking her. She tried to tell defendant what it was, but couldn't talk, she had to write. She experienced no pain in her abdomen, but kept writing notes to the defendant and hospital attendants to look in her throat, there was something terribly wrong with her throat. The morning following the operation she wrote the defendant a note to please look at her throat, that there was something terribly wrong. The defendant told her to open her mouth but she could barely do so. However, he did glance down with a flashlight but said it was nothing more than a little mucus and phlegm, and stated that she was irritating her throat by gagging. Defendant advised her that she was getting along very well and that her operation was going to be just fine. After the defendant left, she continued suffering, choking and gagging, and could not get her breath. She further stated that hospital attendants would try to give her drops of water with an eye dropper. However, just as soon as they would put a dropper of water in her throat, she would choke, strangle and throw her arms in the air and attempt to get the water out of her throat so she could breathe. She continually wrote notes begging anyone who came into the room to please look in her throat, that there was something wrong there. Defendant came to see her again on the evening of the 24th, and she kept writing and pleading with him to find out what was wrong with her throat; that something was in her throat and she wanted him to get it out; that defendant smiled and said, "You will be all right." He stayed but a few minutes. Her throat was swelling shut more and more. She could see the outside swelling of her neck. The attendants applied hot and cold packs. They gave her cough syrup and she begged them not to do so as it would choke her. The following morning, the 25th, after suffering all night with strangling and choking, the defendant was called again. When he arrived, her mother-in-law stated to the defendant: "Her finger nails are black, and if you don't know what that means, I do." The defendant walked out of the room. Later that morning the defendant brought Dr. J. W. Cheney, a throat specialist, to her room. Doctor Cheney opened her mouth and looked down her throat with a light and immediately said "This woman has metal in her throat," and that it would have to be removed immediately. Defendant said "Let's take her up to

the operating room." Doctor Cheney said "There isn't time for that, Charley (defendant)." Plaintiff further stated that they brought forceps to Doctor Cheney and he went down in her throat and pulled out what they called the "airway." The metallic object he removed from plaintiff's throat was a metal disk between the size of a quarter and a half dollar with a hole in it then off that, there were two wire loops about 4 or 4½ inches long. Doctor Cheney held it up and said: "Charley (defendant), this thing should never have happened." He then put the airway on the bed. It was all green and phlegm running down off of it. Doctor Cheney said, "I have heard of a lot of things, Charley (defendant), but this is the first G____-d____ time I have ever seen this." Defendant picked up the airway and threw it into the hall of the hospital. This airway is the type sometimes placed in the mouth of the patient for the purpose of keeping the tongue from falling back in the throat while under the influence of an anaesthetic. She further testified that after the airway was removed from her throat she could breathe, and the first thing she wanted was a drink of water, and to get some sleep. She was unable to speak aloud for several days thereafter; her throat continued to bother her for six months, and she continued to have considerable trouble with it. It was about two weeks after the object was removed from her throat before she could speak above a whisper.

Plaintiff's husband, Martin Bernsden, testified that the morning after the operation he told defendant that the plaintiff was not getting along very well; that she was having a lot of trouble with her throat, and asked him whether there was anything that could be done about it. Defendant said no, that it was just one of those things that could happen. The evening after the operation, defendant told the witness that his mother-in-law was worrying too much about her daughter and that she was all right, and the witness asked the defendant whether they should get somebody else as he was worried about his wife, and defendant again assured the witness that plaintiff was all right. That evening the witness called the defendant again and told him that plaintiff was not resting and that he could hardly hold her in bed. Defendant advised him that he would call the hospital.

Eileen Bernsden, sister-in-law of the plaintiff, testified that just before Doctor Cheney removed the metal object, plaintiff looked blue. She was coughing and strangling, you could hear her out in the hall.

Anna Ricken, mother of plaintiff, testified that on the evening following the operation, plaintiff was strangling and was unable to talk. She looked pitiful. She stayed there until 10 o'clock that evening and plaintiff continued to get worse. At 6 o'clock the following morning, plaintiff was unable to speak. She would write notes. That afternoon she told defendant that she didn't like the way plaintiff was acting and wanted to know what was wrong, and the defendant answered that it was just a common thing; that she asked defendant "Don't you think it would be better to call in a throat specialist?" and she suggested to him Doctor Jager, and he said Doctor Jager couldn't do her any good and he didn't answer her on the throat specialist. Again that evening, witness mentioned to defendant about getting a throat specialist and defendant said there was nothing to worry about, she would be all right. The following morning she told the defendant that plaintiff's fingernails were turning black and she was blue in the face, and requested defendant to take a look at her, and if he didn't know what her fingernails turning black meant, that she did.

Plaintiff's additional evidence, being cumulative, will not be reiterated here.

At the close of plaintiff's evidence, defendant interposed a demurrer. In overruling the demurrer, the trial court stated:

"THE COURT: As a general rule of law in cases of this kind testimony as to the method of treatment, whether or not proper, is a matter of medical men, or professional men of the same profession but this is not all that is true. The case may be such that it is obvious that there was some negligence. The Supreme Court has held that the result itself may be such that the result is evidence of negligence. That isn't all there is in this case. Dr. Cheney is admitted by all parties in this case to be qualified and an expert man in his profession. The evidence shows that he told Dr. Johnson that this thing should not have happened. There is an abundance of evidence in this case to show that this patient suffered beyond what should be expected and her appearance was quite obvious. Even her throat swelled to the extent that it could be observed by anyone."

Defendant did not stand on his demurrer, but chose to introduce his evidence, which may be summarized briefly as follows: He testified he was a physician and surgeon; that on February 23 he was called to the plaintiff's home and made an examination and diagnosed her condition as severe abdominal hemorrhage, and he directed an emergency operation. Her condition at the time was serious; that he did operate; that after the operation, plaintiff complained of something in her throat, that she could not swallow right

and was having difficulty in her breathing. She wrote him several notes which seemed to be her only means of communication. The operation was performed at 5 o'clock on February 23; that he again saw her at 9:30 that evening. At that time the supervisor at the hospital advised him of the plaintiff's condition, in regard to which defendant testified as follows:

"A. She was resting normally and quietly and sound asleep. However, the Supervisor said she had had some kind of a spell along about nine o'clock. She didn't know what to make of it. She said she had never seen anything like it, but that was apparently when she swallowed it as near as we can tell, just from conjecture. That's conjecture you understand, that she swallowed it about nine o'clock in the evening.

"Q. You didn't look at her throat?

"A. Oh she was sound asleep and breathing easily and I didn't see any use to disturb her."

Defendant, to the best of his knowledge and from the hospital records, concluded that plaintiff must have swallowed the airway about 9 p. m. on February 23; that it stayed there throughout the next day and was removed the following day between 9 and 10 o'clock in the morning of the 25th. It was lodged in plaintiff's throat approximately 36 hours. During that 36 hours he called upon the plaintiff four times. Plaintiff's hospital records and chart showed that the airway was used while giving the anaesthetic, but defendant did not notice it when looking at the chart. Defendant next saw the plaintiff at 9 o'clock the morning of February 24. She was complaining of pain in her throat; he again saw her about 5 o'clock that evening and her condition was about the same, and again saw her at 9 o'clock the following morning, the 25th, at which time the throat specialist, Doctor Cheney, came in. Defendant stated that plaintiff's relatives had suggested calling a throat specialist. Plaintiff remained in the hospital until March 20. The defendant testified that he gave no thought to having the plaintiff's throat X-rayed, it never occurred to him; that he recognized it was his duty to care for his patient until she was discharged from the hospital. Defendant also testified that the breathing tube removed by Doctor Cheney from plaintiff's throat was about 4½ inches long. It was of heavy wire construction and that its purpose is to keep the tongue from falling back in the throat.

Defendant called Drs. R. M. Gouldner and A. P. Gearhart, two well-known physicians and surgeons as expert witnesses to testify in his behalf. Doctor Gouldner, on cross-examination, testified

that it is not common medical practice for any doctor to disregard any symptom. Symptoms may be alarming. Ordinarily, in a case like this (instant case) he would call a throat specialist within a few hours or so. He would first make a search for something that would cause the difficulty in breathing. That is the accepted practice. He further stated the average anaesthesia for such an operation as plaintiff's would be ½ to ¾ of an hour, it would not be normal for it to last 36 hours. During the ½ hour to two hours referred to, the patient would experience difficulty in breathing. There would not be a great deal of difficulty. He stated he was familiar with the customs of the hospital and that it is a custom for the doctors who have surgical patients in the hospital to check the charts to see what was done before and after an operation. It is a good, acceptable, medical practice.

Doctor Gearhart, called in behalf of defendant, on cross-examination in answer to plaintiff's hypothetical question relating the facts in the instant case, whether the attending physician used the degree of skill and diligence ordinarily administered by physicians in the community, testified: "That's not the usual normal way."

Upon the evidence introduced in the case, the jury returned their general verdict finding the issues in favor of the plaintiff and against the defendant Johnson, and fixed the amount of recovery at $5,000. Defendant, within the time provided by law, filed his motion for a new trial. After argument was presented on the motion, the court took the same under advisement and on the 31st day of March, 1952, concluded that there was not sufficient expert testimony to support the verdict of the jury, and sustained the defendant's motion for a new trial on that ground, from which order plaintiff appeals to this court contending that the court erred in so holding.

A careful review of the record requires this court to hold that there was both ample professional and nonprofessional testimony sufficient to sustain the verdict of the jury.

Counsel for defendant contends that the negligence of a physician in the treatment of bodily ailments can only be determined by expert testimony. In this jurisdiction, the rule is not quite so narrow. We have been confronted with discussions on this point on several occasions in the past. In *Yard v. Gibbons*, 95 Kan. 802, 149 Pac. 422, it was said:

"Ordinarily only physicians and surgeons of skill and experience are competent to testify as to whether a patient has been treated or an operation per-

formed with a reasonable degree of skill and care, but testimony as to many matters connected with the treatment of a patient, such as the statements and acts of the physician or surgeon as well as the external appearances and manifest conditions which are observable by any one, may be given by nonexpert witnesses." (Syl. ¶ 3.)

And again in *Flentie v. Townsend,* 139 Kan. 82, 86, 30 P. 2d 132, we said:

"Appellant cites the rule laid down in *James v. Grigsby,* 114 Kan. 627, 632, 220 Pac. 267, that—'What is proper treatment to be used in a particular case is a medical question to be testified to by physicians as expert witnesses; laymen, even jurors and courts, are not permitted to say what is the proper treatment for a disease or how a specific surgical operation should be handled,' but ignores the limitations thereafter stated that—'Results, if so pronounced as to be apparent, may be testified to by anyone. (*Sly v. Powell,* 87 Kan. 142, 123 Pac. 881.) And where negligence in the treatment is shown by medical witnesses and the evidence shows a bad result, it is the province of the jury to say whether the result was caused by negligence.' (p. 632.)

"In *McMillen v. Foncannon,* 127 Kan. 573, 274 Pac. 237, this court had occasion to again consider the question, and after quoting the first portion of the quotation from *James v. Grigsby,* supra, said:

"This rule can be applied, of course, only to those matters clearly within the domain of medical science. It is not a judicial determination that the members of the medical profession have a monopoly on common sense. Matters within the common knowledge of mankind may be testified to by anyone familiar with the facts. In *Pettigrew v. Lewis,* 46 Kan. 78, 81, it was said: 'Cases may arise where there is such gross negligence and want of skill in performing an operation as to dispense with the testimony of professional witnesses.' (Citing cases.)" (p. 576.)

See also *Stockhan v. Hall,* 145 Kan. 291, 294, 65 P. 2d 348; *Riggs v. Gouldner,* 150 Kan. 727, 728, 729, 96 P. 2d 694.

A review of the testimony of the expert witnesses reveals that Dr. Cheney, the throat specialist, stated to the defendant when he removed the airway from plaintiff's throat that this thing should never have happened. Doctor Gouldner stated that it was not common medical practice for a doctor to disregard symptoms, that ordinarily in cases like this he would call a throat specialist within a few hours or so; that he would first make a search for something that was causing the difficulty. Doctor Gearhart testified in answer to a hypothetical question relating the facts that the defendant did not use that degree of skill and diligence ordinarily administered by physicians in the community.

In view of the entire record and some of the evidence as hereinbefore related, we do not hesitate to conclude that there was ample

expert testimony submitted in this case to justify the verdict of the jury. Moreover, it required no medical expert to inform the jury that it was negligence for a doctor to permit an airway, a metal disk between the size of a quarter and a half dollar with a hole in it, then off that two wire loops 4 to 4½ inches long, to remain in the throat of a patient for a period of over thirty-six hours, under the circumstances herein. The fact the plaintiff was choking and gagging from the time she came out from under the anaesthetic; that she could hardly breathe and could not talk; that she wrote notes to her physician, hospital attendants and relatives that there was something in her throat, to please get it out as she was choking; that her throat swelled to such an extent that it could be observed by anyone; that her fingernails turned black, and at times they could hardly hold her in bed; that she was unable to take liquids, for she could not swallow; that no X rays were taken, no throat specialist was called in to see her even when requested, until the expiration of thirty-six hours, were all facts that any person of ordinary intelligence could discern, and evidently the jury saw fit to consider that such acts constituted negligent treatment of the patient.

No useful purpose could be gained by prolonging discussion herein. We are satisfied that the record discloses such affirmative expert testimony as well as lay testimony to support the plaintiff's claim, and that the jury was justified in returning its verdict for the plaintiff, and it ought not be disturbed. We think, therefore, the trial court erred in setting aside the verdict and granting a new trial, an error which this court feels its duty to correct. The action of the lower court in granting a new trial is therefore reversed and the cause remanded with directions to enter judgment for the plaintiff upon the general verdict of the jury.

It is so ordered.