No. 40,056

WILLIAM B. NOEL, *Appellant*, v. THE MENNINGER FOUNDATION, a Corporation, and ALBERT E. McCAIG, doing business as McCaig Plumbing Company, *Appellees*.

(299 P. 2d 38)

Opinion filed June 30, 1956.

*T. M. Lillard,* of Topeka, argued the cause, and *O. B. Eidson, Philip H. Lewis, James W. Porter, Charles S. Fisher,* and *Sidney C. Hunt,* all of Topeka, were with him on the briefs for the appellant.

*Ralph W. Oman,* of Topeka, argued the cause, and *Robert L. Webb, Philip E. Buzick, Robert A. McClure,* and *James D. Waugh,* all of Topeka, were with him on the briefs for appellee, The Menninger Foundation.

*Arthur L. Claussen,* of Topeka, argued the cause, and *Harry W. Colmery, James E. Smith,* and *E. Edward Johnson,* all of Topeka were with him on the briefs for appellee, Albert E. McCaig.

The opinion of the court was delivered by

ROBB, J.: This appeal is taken from an order of the trial court sustaining the demurrer of each appellee to the evidence of appellant in an action to recover damages for personal injuries caused by the concurrent negligent acts of appellees.

This case has previously been before this court. Appellant's amended petition was twice attacked by demurrers in the court below and an appeal was taken in each instance from that court's ruling. Since the amended petition is well treated in those decisions (*Noel v. McCaig,* 174 Kan. 677, 258 P. 2d 234; *Noel v. Menninger Foundation,* 175 Kan. 751, 267 P. 2d 934) we will not repeat the allegations thereof herein. Each appellee filed an answer to these amended petitions and, in turn, appellant filed his replies thereto. Thus the issues were joined. In due course a trial was commenced and at the conclusion of the opening statement of counsel for appellant, oral motions of appellees for judgment thereon were overruled, but since no cross-appeal was taken therefrom, the opening statement will not be set out. This brings us to appellant's evidence, which will be condensed and summarized as much as possible.

The testimony of Mrs. Noel, wife of appellant, disclosed that:

Appellant was first placed in St. Francis Hospital due to lack of space at appellee hospital; while there he was under the care of Dr. Kinney and Dr. Dunagin, two physicians of appellee hospital; Mrs. Noel was given a booklet by a social worker of appellee hospital, which was introduced in evidence, wherein the services of the psychiatrist responsible for appellant's care and treatment were explained, in substance, as follows:

Appellant would be placed in a building with locked doors; this was for the security and protection of patients at times "when they may not be sure of themselves, their own impulses, or their new surroundings;" that appellee hospital was aware of the responsibility assumed in treating such patients "whose impulses cannot be self-controlled" when these impulses might be directed to suicide attempts or other ultimately self-destructive behavior; by knowing where a patient was at all times, by removing from his access any articles usable for such end, and by removing money from his possession, the danger of suicide or running away could be minimized; risks sometimes had to be taken knowingly where advantages to the patient outweighed the danger; the fact that a patient was in a locked building did not mean he was constantly confined to his room or such building but when accompanied by a nurse or an aide he would go out for examinations, occupational therapy, and recreation; as the patient knowlingly became more capable and responsible for his actions, his privileges would be extended to leaving the building for specific appointments, for recreation, taking walks, living in an unlocked building, and later making trips to town; the patient may refuse to accept the program and may violate privileges by leaving the grounds without permission, making telephone calls, etc., all of which appellee hospital accepted as part of the patient's illness with which it was prepared to help him; sometimes the patient may undertake to harm himself knowingly, either directly or indirectly, such as by suicide attempt or by his own interference with his ultimate recovery; and finally, the booklet stated that as the appellee hospital got to know the patient better these periods of upset and their form could be recognized and minimized, or often averted, thereby relieving the patient's feelings of remorse and guilt over such behavior which was difficult for him to overcome; in addition by averting these difficult periods

those interested in the patient would likewise be saved from disturbed feelings.

Although the above summary of the booklet given to Mrs. Noel is very brief, we think it sets out sufficient facts to reflect any duties of appellee hospital for the purpose of determining the matter before us.

Mrs. Noel's testimony in addition disclosed that on all her visits with appellant, he was brought over to the adminstration building by a man aide; he seemed to get worse, he had abnormal delusions and ideas, and he seemed more nervous and desired to leave; after the accident hereinafter mentioned, Dr. Kinney thought it necessary that appellant be under constant attention by a male attendant for a year.

Mrs. Noel also testified that she knew Dr. Tarnover was the doctor of appellee hospital in charge of her husband's case; her husband had wanted to come to the hospital but she did not think it was necessary for them to place him in a locked building where she was not allowed to enter because he had only been nervous, he had not shown any traits of mental disturbances, but he had had a nervous breakdown eleven years previously; they had informed her and she thought it was a good thing that appellant took walks around the grounds and participated in recreational activities; she thought he was in a safe place and did not think he was likely to run out into a street; when she visited appellant in the administration building two or three times a week, he knew where he was and he knew people and his surroundings; sometimes they took walks; the doctors had advised her of suicidal attempts on appellant's part; Dr. Tarnover had told her that appellant had tried to put his head into a bucket of water and thus she knew about that although she thought "it was a very funny way of trying to end your life."

The trial court admitted this evidence so far as appellee hospital was concerned for the limited purpose of showing appellant's mental condition but not to establish liability because of any suicidal tendency. So far as appellee McCaig was concerned it was admitted generally.

The trial court then admitted generally the medical records of the appellee hospital which had been compiled by nurses, doctors, and attendants of appellant as a patient therein. Following is a highly summarized excerpt thereof:

Appellant was admitted to the hospital and at the beginning had

physical complaints but he had no noticeable mental disturbances, suicidal or homicidal tendencies, etc., but soon it was felt by his doctors that he would require electric shock treatments; he complained of "going to pieces" and it was thought that he was a suicidal risk and suicidal precautions were necessary; the record stated that if the patient appeared agitated immediate firm kindness with reassurance was to be used; appellant was a "scrawny wisk of a gray old man;" he had a nerve difficulty, was jittery, needed constant attendance of someone, and was losing his mind; appellant was seventy-one years old and impressed Dr. Dunagin as a very long standing hypochondriacal psychoneurotic and he should be handled so as to prevent his making some suicidal gesture; appellant became more paranoid and fearful and intended to kill himself because of fears of death or bodily harm from others; he was placed on suicidal precautions with electro stimulation treatment which was later replaced by electro shock treatment with the possibility of a future lobotomy; appellant took several walks, visited his wife in the administration building, went to craft shop, went to the gym and to a sand lot, but he was always in the company of an aide; on one occasion his belt had been taken away and he stated that he could commit suicide with the bed sheet; at another time when the aide asked him to turn his back to the wind, appellant contended it was just so he could not commit suicide in a nearby lake; and finally, the incident took place where he was in the shower and immersed his head in a bucket full of water.

The records showed that on April 4, 1951, at approximately 3:00 p. m. Mrs. Niggemyer, an employee of appellee hospital, took appellant out for a walk and at about 4:00 p. m. he darted out into Sixth street and was struck by a pickup truck; appellant was taken to St. Francis hospital.

The accident was investigated at 4:25 p. m. that same day by undersheriff Gerald Kreipe and deputy sheriff, Leo Boos. Appellee McCaig's truck was going east on Sixth street—an east and west heavily-traveled street—along the north side of the appellee hospital which separated that hospital from its doctors' offices directly north and across Sixth street. A sidewalk leads north from the front of a two or three floor residence, converted into a clinic building for hospital use, to the south shoulder of Sixth street. To the right or east of the north end of this walk and approximately in the middle of the south shoulder on a substantial, raised concrete base stood

an electrically-operated signal with three tiers of lights. Below these lights was the usual-sized sign with the legend,

"STOP ON RED
"PROCEED ON
"FLASHING YELLOW"

and just below that was a button box. The button was to be pushed to light the red light by any pedestrian wishing to cross Sixth street from the south to the north. Likewise, and in a direct north and south line, another electrically-controlled signal stood just to the north of the paved portion of Sixth street. The officers found skid marks thirty-three feet long beginning west and extending to six feet east of the imaginary line between the signal lights. The skid started from the right or south side of the paved portion and swerved over toward the center thereof. The truck driver said (this was only admitted as to appellee McCaig) that as he approached from the west, appellant and Mrs. Niggemyer were about to cross from south to north when appellant broke away and jumped into the path of the truck. He was struck by the right front fender of the truck at a point six feet west of an imaginary line between the signal posts. The signals were flashing yellow so far as east and west traffic was concerned at that time.

The next morning Mrs. Niggemyer told the officers, in substance, that she and appellant had taken a walk on the golf course; about four o'clock she told appellant she had a meeting to attend and they would have to return to the floor, but he wanted to walk in front of the clinic; she told him, "We're not supposed to walk in front of the clinic;" however, he continued to walk until they got to the north end of the afore-mentioned sidewalk which led to Sixth street and she, after standing a moment said, "All right, now let's go back"; they turned and started back and appellant—just like a flash—darted away and right in front of the truck; she grabbed and lunged for him but could not get him; appellant had wanted to sit on the bench located to the east of the north end of the sidewalk and just south of the south signal light; she had not intended to cross Sixth street to the north although appellant had wanted to; she had explained that they could not go across unless they had a doctor's appointment over there; she had not seen the truck until just before the impact but she said that appellant must have seen it because he immediately turned and dashed out—right in front of it.

Appellant testified that he had taken walks with attendants of appellee hospital, he had the feeling someone was going to hurt him, he did not remember suicidal attempts; he recollected the electric shock treatments, and substantially corroborated Mrs. Niggemyer's statement to the officers with a few exceptions which will be briefly noted. He stated that on the day in question they did not have any talk except about walking on out to the front where the bench was located at the south edge of Sixth street; he said he sat on the bench but she did not; he told her he wanted to see the doctor and she told him that was against the rules; he got up and started over to see the doctor and was hit by the truck; appellant knew it was a street but not a regular highway; he had seen cars on the street on previous occasions when crossing farther down to get to the sand lot; he wanted to explain his problems and fears to the doctor.

At the close of appellant's evidence both appellees demurred thereto. The trial court, in sustaining the appellee hospital's demurrer, properly stated the rule of law concerning negligence in general and stated that the jury would have to resort to speculation as to what treatment was proper and the trial court would likewise have to speculate as to what treatment was proper and it would be unable to instruct the jury thereon.

In sustaining appellee McCaig's demurrer, the trial court stated it felt there was no negligence such as speed, failure to keep a proper lookout, or that he did not observe the flasher light on the part of the truck driver. Appellant ran into the street in front of the truck and was hurt as a result of an accident the circumstances of which did not prove negligence.

Appellant's motion for new trial complaining that the trial court erred in sustaining the demurrers to appellant's evidence and abused its discretion in ruling on motions, evidence, and other matters in the trial of the case was overruled. This appeal followed.

The three questions here presented are whether the trial court erred in sustaining appellee hospital's demurrer; whether it erred in sustaining appellee McCaig's demurrer; and whether it erred in overruling appellant's motion for new trial.

We will take up these demurrers in the order in which they were presented to us. At the outset, however, we must bear in mind that age-old and invariable rule that in testing the sufficiency of the evidence when attacked by demurrer, all of the evidence will be considered as true, we will not weigh any contradictory parts or

discrepancies therein between direct or cross-examination, or among the witnesses, and every favorable inference which may reasonably be drawn therefrom will be given to such evidence. If there is any evidence adduced which sustains the case, the demurrer will be overruled. (*Maust v. Ioerger*, 177 Kan. 558, 280 P. 2d 566; *Jones v. Winn*, 179 Kan. 587, 589, 297 P. 2d 199.) Was there any evidence adduced by appellant to sustain his case?

Appellee hospital's own theory is that the walks taken by appellant with an aide under instructions to exert influence upon the patient only by means of firm kindness were a part of the patient's treatment prescribed by his physicians. As a result of appellant's adverse progress while a patient under their care, those same physicians had prescribed much more treatment for him even to the extent of a possible operation (lobotomy) on appellant's head. Also among the prescribed treatments and directions was the proposition that the aide knew appellant was not to be allowed in front of the clinic because the aide imparted that knowledge to appellant. What did the aide do? She not only allowed him to proceed to the walk in front of the clinic but also to traverse the full length of the walk. The length of the walk is shown only by a photograph in the record so we are unable to state accurately just what that length was. At this point appellant sat on a bench off to the side of the walk and a discussion ensued as to his crossing the highway to the doctor's office and appellant stated he wanted to go to see his doctor. Again we are met with another prescribed treatment or direction which was within the aide's knowledge and also imparted by her to appellant when she told him they could not go over there without a doctor's appointment. It is true the aide's statement to the officers showed they stood there awhile and then turned to go back towards the clinic, but applying our above-stated rule on the evidence, appellant's own testimony showed he got up from the bench—totally oblivious to any traffic—and started across to see his doctor. These were the same tactics he had used to get in front of the clinic and to negotiate the length of the walk to a place within six feet of the edge of a heavily-traveled street and highway and only approximately three feet from the part of the six foot gravel shoulder where such traffic could travel without obstruction. Appellee hospital certainly cannot be heard to say that such actions on the part of the aide were a part of the prescribed treatment ordered by the attending physician under her own statement to the officers.

Walks on the grounds were beneficial but walking into such a place of danger could not be beneficial to a patient such as appellant. We cannot think that appellee hospital proposed that such treatment was prescribed for appellant by its physicians.

In *Noel v. Menninger Foundation*, 175 Kan. 751, 753, 754, 267 P. 2d 934, this court held the allegations of the amended petition which was filed in this case sufficiently stated a cause of action in favor of appellant against appellee hospital when attacked by a demurrer, and we are of the opinion the evidence herein stated supports and establishes those allegations. We are, therefore, constrained to conclude the evidence adduced by appellant was sufficient to establish a prima facie case of negligence on the part of appellee hospital.

Our recent case of *Marks v. St. Francis Hospital & School of Nursing*, 179 Kan. 268, 294 P. 2d 258, stated the following rule applicable to private, noncharitable hospitals for improper care or treatment of patients:

". . . it is clear that a hospital must exercise toward a patient such reasonable care as his known condition may require, and that the degree of care is in proportion of his known physical and mental ailments. It follows that the extent and character of the duty owed by the hospital will depend on the circumstances of each case." (p. 272.)

The facts in the Marks case are distinguishable from our present case, as is shown by this court's comments therein,

"The allegation that the defendant hospital had full knowledge of her mental and physical condition was a conclusion for there was no allegation as to the nature of her physical disability nor as to the character of her mental disorder, and more important, there was no allegation that the plaintiffs, the patient's physician, or any other person, ever advised the person or persons in charge of the hospital that Mary Marguerite Marks suffered from any ailment, physical or mental, that required that she be restrained in any manner. . . ." (p. 273.)

In our present case appellee hospital not only had knowledge of appellant's mental ailment but had prescribed locked doors, constant surveillance and attendance, and restraint by firm kindness.

By some of appellee hospital's contentions it overlooks the facts reflected in the hospital charts and records on appellant that with the passage of time he was *progressively worse* in his fears and mental disorders. In its brief appellee hospital cites authorities which it contends are exactly like and should govern the case at bar. The first was *James v. Turner*, 184 Tenn. 563, 201 S. W. 2d

691, where a patient in a sanitorium for treatment for mental and nervous diseases had shown *marked improvement* during his stay in the sanitorium. While walking on the grounds on which a 12,-000-gallon water tank fifty-three feet in height with a ladder from the ground to the top was located, the patient, who was accompanied by an attendant, asked the attendant the capacity of the tank and the patient was told its capacity. The patient ran from the attendant, climbed the ladder, jumped into the tank, and was drowned. The patient in the James case *had been taken to town* on one or two trips and *had voluntarily gone into a barbershop.*

The second case was *Mills v. Society of New York Hospital,* 242 App. Div. 245, 274 N. Y. S. 233, 270 N. Y. Rep. 594, wherein the patient was suffering from involutional melancholia and had tendencies toward suicide which were known to the hospital. The patient had *shown improvement,* was not particularly disturbed or distressed and had responded favorably to physiotherapy or ultra-violet ray treatment. He, in company with ten other patients and two aides, was taking a prescribed walk along a medium traveled macadam road. When about ten or fifteen feet from his nearest companion the patient got down on his hands and knees and placed his head under the wheel of a bus which was moving at a speed of eight miles per hour, and the patient was killed. The court there held it was an error in medical judgment on the part of the doctors in that the patient was not as convalescent as they had thought, that due to his affliction he had succeeded in doing away with himself, but that the defendant hospital was not liable.

The third case was *Hohmann v. Riverlawn Sanatorium,* 103 N. J. L. 458, 135 A. 817, where the patient was admitted to the sanatorium for treatment and examination as to his mental condition after having made two unsuccessful attempts at suicide prior to such admission. He was *not admitted* under any provision *for restraint or confinement* either by legal proceedings or voluntary imposition. Just a few days later the patient disappeared and his dead body was found hanging from a tree in a woods. It was held that his death was not the proximate result of any failure of duty owing to him by respondents under their agreement of admission.

In view of the evidence summarized herein, we cannot agree with appellee hospital that these cases present the same propositions as are contained in our case. We think the distinguishing elements are apparent without further comment thereon.

In addition to what we have already said and for emphasis, we refer again to *Noel v. Menninger Foundation,* supra. What we said there referring to allegations in the petition is appropriate here,

"In these paragraphs it was alleged that the plaintiff, a patient of the type indicated . . . told the attendant . . . that he wanted to go across the highway to the other side where the hospital doctors were located. Being apprised of this desire on the part of the plaintiff, the attendant should have been alert to restrain the plaintiff from going on the highway. Expression of such a desire by such a patient is adequate warning that, unless restrained, there will be an attempt to carry out the desire." (p. 753.)

We conclude that the trial court should have overruled the demurrer of appellee, The Menninger Foundation, to the evidence of appellant.

In regard to the ruling of the trial court on the demurrer of Albert E. McCaig to appellant's evidence, we will not burden the record by repetition of the evidence already set out above and will proceed with the determination of whether the evidence was sufficient to constitute negligence on the part of appellee McCaig. The petition, which was held sufficient to allege negligence on the part of McCaig when attacked by a demurrer, was summarized fully in *Noel v. McCaig,* 174 Kan. 677, 679, 680, 258 P. 2d 234, and that makes it unnecessary to set out the allegations in full at this time. It can readily be seen that a marked difference exists between the sufficiency of the evidence to establish the allegations as to McCaig's negligence and the sufficiency thereof to establish the allegations of negligence against appellee hospital. Without laboring the point, we think the evidence in this instance totally failed and for that reason the trial court was correct in sustaining the demurrer of McCaig to appellant's evidence.

Other questions were raised by the record of which we are not unmindful but in view of what we have said, it is not necessary to cover them.

The judgment of the trial court in sustaining the demurrer of The Menninger Foundation is reversed with directions to overrule the demurrer and to grant a new trial.

The judgment of the trial court in sustaining the demurrer of Albert E. McCaig is affirmed.

Price, J., dissents in part, being of the opinion that the judgment should be affirmed in its entirety.