No. 40,451

LAYMOND L. GOHEEN, *Appellant*, v. HAROLD L. GRABER, M. D., and GRACE HOSPITAL AND SCHOOL OF NURSING, a Corporation, *Appellees*.

(309 P. 2d 636)

Opinion filed April 6, 1957.

*C. H. Morris,* of Wichita, argued the cause, and *Robert F. Bailey* and *Willard J. Kiser, Jr.,* both of Wichita, were with him on the briefs for the appellant.

*Roy C. Davis* and *Eugene A. White,* both of Hutchinson, argued the cause, and *Frank S. Hodge, Robert Y. Jones* and *H. Newlin Reynolds,* all of Hutchinson, were with them on the briefs for the appellees.

The opinion of the court was delivered by

PRICE, J.: This was an action by a surviving husband to recover for the wrongful death of his wife, alleged to have resulted from the negligence and malpractice of defendant physician and hospital.

The appeal is from the order of the trial court sustaining defendants' separate demurrers to plaintiff's evidence.

Plaintiff's wife died in childbirth, and the petition charged defendant physician with the following acts of negligence and malpractice:

That he was late in arriving at the hospital and permitting her to be immediately placed in the labor room without taking the necessary steps to emotionally prepare her for labor and delivery; that he allowed the hospital nurses to take complete charge of her except during the times he was personally present; that he failed to personally examine her as soon as labor started in order to de-

termine the status of the membranes and failed to give an abdominal and rectal examination; that he permitted her to be placed in the delivery room prematurely and to be left alone most of the intervening time; that by proper observation and examination he knew, or should have known, of the abnormal fetal presentation; that he failed and refused to make an accurate diagnosis and failed to use appropriate methods and X ray to determine the cause of the abnormal and prolonged labor; that he failed and refused during all the prolonged and abnormal labor to administer approved supportive measures, such as adequate diet, rest, medical therapy and medication; that he failed to perform a Caesarean operation and relied upon delivery of a transverse presentation by instruments and pressure by two hospital nurses, thus causing the rupture and hemorrhage, and that he allowed hospital nurses, who were unlicensed to practice medicine and surgery, to perform the services he was duty-bound to perform.

The defendant hospital was charged with negligence and malpractice in that it undertook to render services to her through its nurses and employees which are customarily, and should be, performed only by physicians; that the nurses and employees failed to call defendant physician or a hospital staff doctor when her condition required such services; that when delivery was imminent the hospital failed to furnish an intern or other physician to be in constant attendance until defendant physician arrived; that notwithstanding the prolonged labor, evidence of breech birth and other conditions, the hospital was late in calling or notifying defendant physician; that the hospital, through its nurses and employees, administered sedatives and other medications without full knowledge of the limitations, dangers and reactions thereof; that it failed to report adequately to defendant physician, or some other doctor, the true condition of the patient; that it failed at all times material to carry out, fulfill and perform good and approved hospital care and practice, and that all of the acts and omissions on the part of both defendants were contrary to and in violation of the standards of medical services properly rendered by physicians and hospitals in the community, and that all of such alleged acts of negligence and malpractice, individually and in concert, operated together and constituted the proximate and direct cause of death.

Highly summarized, the evidence established the following:

The defendant, Dr. Graber, is a practicing physician in Hutchin-

son specializing in obstetrics. Defendant hospital is located in Hutchinson. Several months after plaintiff's wife, Norma Goheen, became pregnant, she went to Dr. Graber for treatment. She was the mother of three children and Dr. Graber had been her doctor on each of her former pregnancies. During her last pregnancy, and in connection with which her death resulted, as hereafter related, there were no symptoms of anything unusual, and all signs pointed toward a normal childbirth with normal results. Early in the morning of February 6, 1954, Mrs. Goheen had a discharge indicating the imminence of commencement of labor, and called Dr. Graber by telephone. He directed her to go to defendant hospital at once, which she did. He arrived at the hospital a few minutes after she did and his examination of her showed that she was not yet in labor but that early labor was anticipated. This was at about 5:45 a. m. There was nothing to indicate anything wrong with her condition or that delivery would be anything other than normal. Later that morning the doctor directed some medication, and at 2:00 o'clock that afternoon he made another personal examination. There being no signs of definite labor he directed further medication. Shortly afterwards a few contractions commenced, and at 3:30 p. m. the membranes or water bag ruptured normally. Thereafter the contractions increased to proper stage and medications were discontinued. At 10:45 that night the doctor again made a personal examination and directed medication. At 2:00 o'clock the next morning obstetrical nurses, who, in the meantime, had been taking care of Mrs. Goheen in the regular course of their professional duties, advised the doctor that her progress was nearly complete. He arrived at the hospital a few minutes later, after which the fetus was delivered. Blood plasma and oxygen were administered to Mrs. Goheen, but she died at 3:22 a. m.

An autopsy was performed by a recognized and experienced pathologist and this examination disclosed that Mrs. Goheen's death occurred as a result of hemorrhage due to a rupture of the uterus after delivery. The evidence further disclosed that the upper part of the uterus, instead of thinning out as the fetus developed, as is ordinarily the case, was more than twice the usual thickness, while the lower and smaller part of the uterus, where the rupture occurred, had developed extremely thin, and that such condition was latent and a very unusual type of abnormality, and that ordinarily there would be no warning of such condition prior to delivery.

With respect to the part played by the hospital and attending

nurses, the evidence disclosed that there was nothing unusual or out of the ordinary in connection with Mrs. Goheen's pregnancy leading up to her actual delivery, and that during the period she was in the hospital she was under the routine and regular care of nurses of many years experience, and that they ministered to her in the usual and ordinary manner in the light of her known condition. During this period she was given the usual and customary rectal examinations, and nurses assisted the doctor in the actual delivery, as was customary.

Medical testimony was to the effect that at her state of pregnancy a vaginal examination would be improper and that only rectal examinations should be, and were, given to Mrs. Goheen. Plaintiff testified that he was in the delivery room a part of the time and that he observed what the nurses were doing with respect to making examinations, and he expressed the opinion that his wife was given a vaginal examination. He also testified concerning pressure applied by the nurses to his wife's abdomen. There also was testimony from several members of Mrs. Goheen's family concerning a conversation had with Dr. Graber the day following her death in which he was alleged to have said that perhaps her life could have been saved if a Caesarean operation had been performed.

As stated, at the conclusion of plaintiff's evidence the trial court, after commenting somewhat at length on the evidence and questions involved, sustained demurrers by Dr. Graber and defendant hospital.

The correctness of that ruling is the question presented for review.

We first consider the case against the defendant physician.

Questions respecting the liability of physicians in malpractice cases have been before this court on numerous occasions, commencing with *Tefft v. Wilcox,* 6 Kan. 46 (1870), and ending with *Bernsden v. Johnson,* 174 Kan. 230, 255 P. 2d 1033 (1953). In between are to be found such frequently-cited cases as *Pettigrew v. Lewis,* 46 Kan. 78, 26 Pac. 458; *Sly v. Powell,* 87 Kan. 142, 123 Pac. 881; *Yard v. Gibbons,* 95 Kan. 802, 149 Pac. 422; *James v. Grigsby,* 114 Kan. 627, 220 Pac. 267; *McMillen v. Foncannon,* 127 Kan. 573, 274 Pac. 237, and *Flentie v. Townsend,* 139 Kan. 82, 30 P. 2d 132. From these and many other decisions the following rules have become firmly established:

The relationship between a physician and his patient, implied in law, is that he possesses that reasonable degree of learning and skill ordinarily possessed by members of his profession and of his

school of medicine in the community where he practices or similar communities, having due regard for the advance in medical or surgical science at the time, and that he will use such learning and skill in his treatment of the patient with ordinary care and diligence. This rule is elementary and is founded on considerations of public policy, its purpose being to protect the health and lives of the public. A physician is not a guarantor of good results, and civil liability does not arise merely from bad results, nor if bad results are due to some cause other than his treatment. In case of doubt as to which of two or more courses is to be pursued a physician is bound to use his best judgment. On questions of a medical or scientific nature as to what is the proper treatment to be followed in a particular case only those who are qualified as experts are permitted to testify, the reason being that lay witnesses, courts and jurors are not permitted to say what is the proper treatment for a disease or how a specific surgical operation should be performed. This rule is not to be considered as a judicial determination that the members of the medical profession have a monopoly on common sense, and is limited only to those matters clearly within the domain of medical science. If, in a given case, the bad results are so pronounced as to be apparent to anyone, and if what was done or not done in the treatment of a patient is so obvious and within the common everyday knowledge of persons generally, such facts may be testified to by persons other than physicians. An illustration of this would be such as where a physician fails to take steps to set a broken bone, or where a surgeon sews up a wound leaving some foreign article or substance in the body. In the Bernsden case, *supra*, the trial court set aside the verdict of the jury and granted defendant a new trial on the ground that expert testimony introduced was not sufficient to sustain the verdict. There a metal disk had been allowed to remain in the throat of a patient for a period of over thirty-six hours, and in reversing the lower court it was held that such fact, together with related matters, were such as could be discerned by any person of ordinary intelligence, and that lay testimony, together with the medical testimony introduced, was sufficient to sustain the verdict.

Applying the general rules just stated to the evidence in this case, what do we find? The evidence consisted almost entirely of testimony by the pathologist who conducted the post-mortem examination and of the attending nurses. All of the questions and matters in issue were clearly within the realm of medical science,

and, without summarizing the evidence more than already has been done, it may be said there is not one iota of medical evidence to indicate that defendant physician was guilty of negligence or malpractice in diagnosing or rendering medical care to the deceased. In fact, all of the medical evidence affirmatively established that defendant physician did conform to proper practices and usages in the light of all attendant circumstances.

Some point is made of the fact that plaintiff testified to the effect that in his opinion his wife was given a vaginal rather than a rectal examination. In the first place, such statement on his part was purely speculative, and secondly, the specific type of examination made was a matter of medical evidence concerning which he was not qualified to testify.

Another point is made of the alleged statement by defendant physician the next day to the effect that perhaps the life of plaintiff's wife might have been saved had a Caesarean operation been performed. Assuming that such remark was made, it constitutes no evidence that, under the circumstances and conditions existing prior to her death, and of which the doctor and nurses in the exercise of skill and diligence were well aware, it was negligence and malpractice not to perform a Caesarean operation.

Another point is made concerning nonuse of X-ray equipment. A short answer to this contention is that all of the evidence introduced established no reason for the use of X-ray equipment at any time preceding delivery, because all symptoms of the patient indicated normalcy in every respect, and, as heretofore related, the rupture of the uterus was due entirely to a latent abnormal condition of that organ. All of the evidence was to the effect that nothing could have been done which was not done after delivery and the occurrence of the rupture, such fact being the first symptom of the unusually abnormal and latent condition existing.

Insofar as defendant physician is concerned, matters concerning his professional acts in this case were matters solely within the realm of medical science and no evidence was introduced, expert or otherwise, to make out a *prima-facie* case of negligence and malpractice on his part. Negligence is never presumed—it must be established, and until established by competent evidence, a jury has no function to perform. Plaintiff's evidence not only did not establish negligence—it in fact refuted it. The demurrer of defendant physician was properly sustained.

Much of what has been said also applies to the alleged liability of

defendant hospital. In the recent case of *Marks v. St. Francis Hospital & School of Nursing*, 179 Kan. 268, 294 P. 2d 258, general rules with respect to the liability of a hospital for negligence in the care of a patient were discussed, and it was said that a private hospital must exercise toward a patient such reasonable care as his *known* condition may require, the degree of care being in proportion to his known physical and mental ailments. Textbook authorities cited in the opinion are to the effect that the extent and character of the care that a hospital owes its patients depends upon the circumstances of each particular case, and that the measure of duty of a hospital is to exercise that degree of care, skill and diligence used by hospitals generally in that community and required by the express or implied contract of the undertaking, and that a hospital is liable for want of ordinary care whether from incompetency of a nurse or failure in duty of a fully qualified nurse. See also *Noel v. Menninger Foundation*, 180 Kan. 23 (Syl. 2 and 3), 299 P. 2d 38.

As heretofore stated, up until the actual time of delivery there was absolutely nothing about Mrs. Goheen's condition to indicate there was anything unusual or abnormal about her case, or that it differed from any of the thousands of obstetrical cases handled by the qualified and experienced nurses in attendance. In other words, insofar as Mrs. Goheen's physical condition was *known* to the hospital and nurses, it was just another obstetrical case, and there was no evidence to indicate or establish that she was not ministered to and cared for in the customary routine manner as her *known* condition required and demanded. Medical evidence was to the effect there was nothing abnormal about a transverse delivery, and that very frequently external pressure is applied to the abdomen at the time of delivery.

Plaintiff relies heavily on the holding in *Garfield Memorial Hospital v. Marshall*, 204 F. 2d 721 (1953), where the liability of a hospital for negligent failure to provide proper care and attention during a mother's labor and delivery was in issue. Reference to the facts of that case, however, clearly distinguishes it from the one before us. There, among other things, the uncontroverted evidence showed a hazardous journey to the delivery room with the baby's head already protruding, the practically unassisted move from the cart to the delivery table, the unattended precipitous delivery, and the fall of the baby upon the rubber mat on the metal table.

As has been said with respect to defendant physician, negligence is never presumed—it must be established, and until established by

competent evidence a jury has no function to perform. Tested by the rules heretofore mentioned with respect to a hospital's liability for negligence and malpractice, plaintiff's evidence not only did not establish negligence—it in fact refuted it. The demurrer of defendant hospital was properly sustained.

The judgment of the trial court is affirmed.

Robb, J. (dissenting): The general rule in actions of this type is that strong reliance has to be placed on expert rather than lay testimony. However, laymen can testify regarding those things they actually see, and what they hear the experts say, or conversations had in the presence of experts. (*Bernsden v. Johnson*, 174 Kan. 230, 236, 237, 255 P. 2d 1033.)

I dissent from the majority opinion of the court as to the ruling on the demurrers because I believe we are bound by the oft-stated rule reiterated in *Noel v. Menninger Foundation*, 180 Kan. 23, 299 P. 2d 38, which was cited with approval in *Koch v. Suttle*, 180 Kan. 603, 606, 306 P. 2d 123. In the Noel case we said:

"In testing the sufficiency of the evidence when attacked by demurrer all of the evidence will be considered as true, it will not be weighed as to any contradictory parts or discrepancies therein between direct or cross-examination, or among the witnesses, and every favorable inference which may reasonably be drawn therefrom will be given to such evidence. *If there is any evidence which sustains the case, the demurrer will be overruled.*" (Syl. ¶ 1.) (My emphasis.)

For clarity, reference to the evidence of witnesses will be made in sequence as to time instead of in the order in which such evidence appeared in the record.

What does the record show? Appellant, whose deceased wife weighed 220 pounds, testified that when he took his wife to the hospital, she noticed a bloody discharge and she was hysterical.

The charts, which were part of the permanent records of the hospital and were identified by its superintendent, were kept by the same nurses who were placed on the stand by appellant and who testified in regard to the entries made thereon. The first nurse called as a witness had signed the charts but had not made all the entries. The charts contained entries stating "Show bloody," "Small amt. blood-tinged discharge . . . 5:00 p. m. every 2 to 4 minutes," and ". . . at 6:00 p. m., every one minute hard, duration 50 sec. dark green discharge. . . ." The charts indicated Doctor Graber saw the patient at 10:45 p. m., made a rectal examination and entered on the charts the comment that they, "Must consider

breech presentation although still seems to be the head." The charts showed no other visit by the doctor until 2:10 a. m. just prior to the birth. The doctor had caused an entry to be made on the patient's chart at the time of her admission to the hospital at 5:45 a. m. on February 6, 1954, stating, "Patient not in labor but has passed some show of blood at home and is admitted in anticipation of early labor."

The charts showed a number of rectal examinations by the nurses with conclusions arrived at by them as to location and placement of the baby's head. Certain medications were administered to the patient by these same nurses and while the evidence is somewhat contradictory, it was fairly established that some of these medications were to induce labor pains and uterine contractions and after these had started, then another medication was administered by the nurses to slow down labor and reduce pain.

The testimony interspersed with explanations of the charts by the nurses included information not fully reflected in the charts alone to the effect that the patient was left totally to the nurses who made the rectal examinations and made conclusions therefrom, who administered medications, including drugs and narcotics that could be dangerous if given in excess, and then telephoned the doctor to advise him of the progress and to get directions from him. These nurses testified they knew how to make these examinations and how to administer the drugs, but they admitted they were not sure of their findings, deductions, and conclusions; the doctors were the persons qualified to do this. There were no internes or staff physicians at this hospital. X-ray equipment was available in the hospital. The nurses further testified that sterile vaginal examinations were sometimes used in the event a breech birth was expected.

At about 2:10 a. m., in the opinion of the nurses, the buttocks of the baby appeared and the doctor was called. It was a still birth.

We return to appellant's testimony relating to what he saw and heard in the labor and delivery room. (The record does not show whether more than one room was used.) When the medications were administered, the patient's water broke, and she told him, in the presence of the nurses, that was as close as she ever came to dying. She told the nurses she was ready to have her baby if they would just let her bear down, but they turned her on her side to stop the pains and told her they would tell her when it was ready to bear down. This was the patient's fourth child. The same doctor had delivered the three previous children.

Appellant further testified that the nurses were in and out but he had been left alone to the extent that he would have to go out in the hall to get a nurse to bring a bedpan. They would not use the bedpan on the delivery table so she used it on the floor. His wife lost so much blood that he became sick and had to leave the room.

In a subsequent conversation the doctor told appellant that his wife was too big a woman to have a little baby; that he possibly could have saved both the mother and baby by a Caesarean operation but doctors look forward and not backward. Three other witnesses heard this statement of the doctor regarding the Caesarean operation. The doctor had relied on the fact that three previous births by this mother had been successful. He had not anticipated any trouble with this one.

Dr. Lorin E. Dickelmann, a pathologist who performed an autopsy on the deceased mother, testified that X-ray was usually done at a previous time to determine the position of the baby but doctors would not necessarily have to resort thereto. He found the uterus was unusual in that it was thick at the top and thin at the bottom. In reply to a question as to whether this could be detected by X-ray, Doctor Dickelmann stated that any gynecologist will try his best to make that diagnosis if he can. The more abnormal the birth, the greater the possibility of tearing something since the getting through would be more difficult. If the condition could be recognized, a doctor would have to examine, to go in and do something about it. He did not recommend a vaginal examination until a doctor was ready to go ahead and deliver. He had noted there were some areas of contusions on the chest of the child.

As stated at the outset, my opinion is that the correct rule to be applied to this testimony, because we have consistently committed ourselves thereto, is the one previously quoted from the Noel case, *supra*.

The result is I am convinced that not only is there *some* evidence but there is much more than necessary to require that both demurrers be overruled. From the record, the hospital through its nurses assumed duties which the nurses were admittedly not qualified to carry out, and the doctor, who had the qualifications to realize and diagnose the condition of his patient, left everything up to the nurses. In this case we are considering the proof

of the appellant and the demurrers thereto. Appellees' testimony may present an entirely different picture, but we do not have that picture before us now. In my opinion, both demurrers should have been overruled.

WERTZ, J., concurs in the foregoing dissenting opinion.